## McCoy vs. The State of Georgia.

1. The principal witness for the State having testified that he swore before the coroner's jury that he did not know who committed the homicide, that the prisoner had threatened his life if he ever told on him, and that acting under the fear induced by this threat, he concealed his knowledge and swore to his ignorance, it was error for the court to charge the jury that "one is not responsible for crime committed under duress," at the same time defining duress thus: "Duress consists in . . . threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." Section 2637 of the code, from which this definition was taken, relates not to crime, but to contract. To render threats or menaces available as an excuse for a person charged with crime, they must be "threats or menaces which sufficiently show that his or her life or member was in danger, or that he or she had reasonable cause to believe, and did actually believe, that his or her life or member was in danger."

2. Is perjury committed in a legal tribunal, in the midst of officers and ministers of the law, with full opportunity to demand surety of the peace and appeal to the State for protection, one of the offences for which fear is a legal excuse? Quære.

3. But though the witness might be legally culpable by reason of false swearing under the influence of a groundless or needless fear, yet if fear for his life existed and was the real cause of his dereliction, and he now swears truly, the jury may credit his testimony irrespective of his responsibility for yielding to his fears on the former occasion. The court, however, should not grant him legal absolution, but leave the jury to deal with the question of his veracity as one of fact.

4 For the jury, without the knowledge or consent of the prisoner, and without leave of the court, to receive and keep in their room, whilst deliberating on the case, the gun with which the State contends the homicide was committed, and the coat worn by the

deceased at his death and pierced with the fatal shot, is unwarranted by law.

May 9, 1887.

Criminal Law. Witness. Perjury. Duress. Practice in Superior Court. Before Judge BRANHAM. Walker Superior Court. August Term, 1886.

James McCoy was indicted for the murder of William D. Kellett, charged to have been committed on December 6, 1885. On the trial, the principal witness for the State was Calvin Young. He testified, in brief, as follows : On Sunday, December 6, 1885, Kellett, who was a deputy United States marshal, arrested the witness at his father's house, in Walker county, on a charge of violating the internal revenue laws, and started to carry him to Atlanta. Kellett had a horse, and after starting along the road, stated that he would ride awhile and the witness could walk, and then they would exchange and ride alternately. At a point two and a half miles from the house, they reached a creek. There were two ways to cross it : one by a road where a bridge had been, but which was somewhat rough at that time ; the other by a ford a little lower down. The witness suggested that it would be better to go by the ford, and Kellett asked if he could get across on a foot-log that was there, adding that his horse could get across. Young started across on the log and Kellett started into the creek. As he reached the edge of it, some one fired upon him from a point a few feet away from the road among some bushes and rocks. The witness looked up and saw McCoy and another man run away through the bushes. They were within about seven or eight steps from the road and about twelve steps from the witness. It was late in the evening, about dark. The horse jumped backwards and Kellett fell, striking on his feet and then falling backwards, with his left side in the creek. The witness went to him, caught and hitched the horse, and asked if Kellett was hurt. He replied that he

was shot through the lungs. Witness endeavored to pull him up, but was unable to do so, and said he would go for assistance. He started towards his father's house, but after going a short distance was stopped by McCoy and his comrade, who came out of the woods. McCoy had a "half-stock" rifle, and he pointed it toward the witness, made him hold up his hands, cursed him and told him that if he said anything about McCoy's being there, he would not live twenty-four hours, and if he never told, it would never be known who killed Kellett. He then told Young to go on, and after giving McCoy time to get home, to go there, and he (McCoy) would return with him. McCoy's house was about one and a quarter miles from Young's father's, but the distance was shorter through the woods than by the road. The witness went on to his father's, told those there that some one had shot Kellett, and obtained assistance. It was suggested that it would be well to have others along, and thereupon the witness and another went to McCoy's house and told those present that Kellett had been shot. McCoy and the man who was with him saddled horses and the entire party returned to the scene of the murder. McCoy stated that he had just returned from hunting grapes. Afterwards he said he was going to Texas, and asked the witness if he did not wish to go, but the latter declined. At the inquest, held about ten miles away, the witness testified that he did not know who shot Kellett. McCoy was not present, but there were the sheriff and the justice (who acted as coroner) and others. He further testified on the inquest that McCoy had a short "half-stock" rifle; that he had spoken of seeing six revenue officers killed at once; that he was of a dangerous character; and to other circumstances concerning him. He denied knowing who committed the murder, through fear that McCoy would kill him.

The State also introduced testimony to show previous threats by McCoy to kill Kellett because the latter had once shot him; that McCoy was summoned to appear at

the inquest, but did not go; that he left home shortly after the murder and was absent for some time; that when a deputy marshal sought to arrest him, he resisted and attempted to shoot that officer; and other facts which need not be stated in detail.

It is unnecessary to set out the evidence for the defendant further than to say that it conflicted with that of the State; and that there was impeaching testimony and evidence tending to show an *alibi*. The jury found the defendant guilty. He moved for a new trial on the following among other grounds :

(1) Because the verdict was contrary to law and evidence.

(2) Because the court charged as follows : "The witness, Calvin Young, admits having testified on oath before the coroner's inquest, while that body was investigating this homicide, that he did not know who shot Kellett. But he says that he so testified because the defendant, James McCoy, had threatened to take his life if he testified against him, and that he gave his testimony before the inquest under duress, and so testified because he feared personal violence from McCoy if he should disclose what he knew about his connection with the matter; and he further says now that when he testified then that he did not know who did the shooting, he did not tell the truth, for the reasons given; and he now says the defendant, McCoy, shot Kellett, and that the testimony which he has given in detail in this trial before you is the truth."—The error alleged was that this charge presented in detail the theory of the case as claimed by the State, but failed to present that set up by the defence.

(3) Because the court charged that "one is not responsible for crime committed under duress."

(4) Because the court charged as follows : "Although a witness may be impeached by other witnesses and may not be afterwards corroborated, yet it is a question for the jury to determine whether the impeachment of the wit-

ness has been successful, and whether or not the witness is to be believed."

(5) Because the court erred in charging the jury in the following manner: Request by defendant's counsel, Mr. Glenn: "In considering the question whether or not the witness, Young, acted under duress, the jury are to take into consideration the time, place and circumstances surrounding the witness at the time the testimony was delivered." To which the court merely responded, "Yes," and then charged in that connection: "You can take into consideration all the circumstances surrounding the witness and any other matter which would put him in jeopardy; whether he had any reason to believe that he would be killed, or to fear McCoy in case he should swear against him, and if there were any threats, to believe such threats would be executed if he did so swear."

(6) Because the gun sworn to have been McCoy's, the cartridge sworn to have been taken from it at his house a few days after the homicide, and the coat worn by the deceased with the holes in it through which the ball passed, were in possession of the jury during their consideration of the case, without the knowledge of the court or defendant's counsel, though they had not been introduced in evidence. [It appeared from the certificate of the presiding judge, and the affidavits of jurors and the bailiff in charge of them, that the gun, coat and cartridge were identified by witnesses and exhibited to the jury, though not formally introduced in evidence during the trial; that one juror took up the cartridge in the presence of one of counsel for defendant, and when the jury retired, it was carried out with them, the gun and coat being left in the court-room near the jury-room; and that shortly after they retired, they requested the bailiff in charge to bring them these articles, and they were examined during the jury's consultation.]

The motion was overruled, and the defendant excepted.

W. C. Glenn; Gartrell & Ladson ; Geo. R. Brown, for plaintiff in error.

Clifford Anderson, attorney-general; C. T. Clements, solicitor-general, by Copeland & Hunt, for the State

Bleckley, Chief Justice.

McCoy was tried for the murder of Kellett and convicted. He moved for a new trial on several grounds, and the motion was overruled. Kellett, at the time on duty as a revenue officer of the United States, was assassinated in the mountains of Walker county. Having in custody one Calvin Young, whom he had arrested upon a warrant and was conducting to prison, he was shot down in the road, and did not live to make any communication as to the perpertrator or the circumstances of the crime. On Young's testimony alone, together with a few supporting facts, such as previous threats, McCoy was convicted. Without the testimony of Young the verdict could not have been rendered, or if rendered, could not be upheld. The real pressure of the case, therefore, was and is upon the credibility of Young.

Shortly after the homicide, an inquest was held by the coroner over the body of the slain man. The place of holding the inquest was some miles distant from the scene of the killing. McCoy was not present, but many other persons were present, amongst them one or more of the county officers, besides the coroner. Young was a witness before the jury of inquest, and then testified that he did not know by whom the shot was fired, or who it was that killed Kellett. At the trial of the indictment, in the superior court, his testimony was directly to the reverse of this, being that he did know, and that McCoy was the perpertrator of the deed. He went into all the details of the killing and of McCoy's conduct on the occasion, testifying, amongst other things, that after firing the shot, McCoy came down to the road out of the woods, and had a con-

versation with him, in which conversation McCoy threatened to kill him if he ever told that he, McCoy, was the person who did the shooting; that this threat caused him to be in fear for his life, and that under the influence of the fear so excited, he testified before the jury of inquest that he did not know, when in truth he did know.

1. To aid the jury in dealing with the question of Young's credibility, the court instructed them on the subject of duress, and we think the instructions given were erroneous. The principal witness for the State having testified that he swore before the coroner's jury that he did not know who committed the homicide, that the prisoner had threatened his life if he ever told on him, and that acting under the fear induced by this threat, he concealed his knowledge and swore to his ignorance, it was error for the court to charge the jury that "one is not responsible for crime committed under duress," at the same time defining duress thus: "Duress consists in  . . . . threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." Section 2637 of the code, from which this definition was taken, relates not to crime but to contract. To render threats or menaces available as an excuse for a person charged with crime, they must be threats or menaces which sufficiently show that his or her life or member was in danger, or that he or she had reasonable cause to believe, and did actually believe, that his or her life or member was in danger." Code, §4303. The article of the code in which section 2637 occurs treats of private sales. A previous section in the same article, §2633, says, "Fraud or duress by which the consent of a party has been obtained to a contract of sale, voids the sale." In a chapter of the code which treats of illegal and void contracts, §2752, this language occurs: "The free assent of the parties being essential to a valid contract, duress either of imprisonment or by threats, or other arts, by which the free will of

the party is restrained, and his consent induced, will void the contract."

It must be obvious to the deliberate judgment of every reflecting mind that much less freedom of will is requisite to render a person responsible for crime than to bind him by a sale or other contract. To overcome the will so far as to render it incapable of contracting a civil obligation, is a mere trifle compared with reducing it to that degree of slavery and submission which will exempt from punishment. The measure of coercion through the passion of fear applicable to criminal acts is laid down in section 4303 of the code, above quoted. And this measure is widely different from the definition of duress contained in §2637.

2. True it is that perjury cannot be committed without willfully, as well as knowingly, absolutely and falsely swearing (code, §4460), but this does not imply that more moral freedom is required in the commission of perjury than in the commission of murder or any other crime. No less degree of fear will excuse perjury than other felonies. He who swears falsely under the influence of fear excited by threats or menaces is not guiltless unless overcome by danger, or by reasonable apprehension of danger, to life or member. And it may well be doubted if the danger, or apparent danger, must not be a present impending one, not a mere remote contingency referable to an indefinite future. Why should a less urgent and pressing danger suffice for excusing perjury than for excusing larceny, arson or homicide? Is perjury committed in a legal tribunal, in the midst of officers and ministers of the law, with full opportunity to demand surety of the peace and appeal to the State for protection, one of the offences for which fear is a legal excuse? *Quære.*

3. But though the witness might be legally culpable by reason of false swearing under the influence of a groundless or needless fear, yet if fear for his life existed and was the real cause of his dereliction, and he now swears truly,

v 78-32

the jury may credit his testimony, irrespective of his responsibility for yielding to his fears on the former occasion. The court, however, should not grant him legal absolution, but leave the jury to deal with the question of his veracity as one of fact. In the present case, the court did not undertake to determine any question of fact, but stated as a proposition of law that, " one is not responsible for crime committed under duress." This was absolving the witness conditionally from legal responsibility, and taken in connection with the erroneous definition of duress as applied to crime, was calculated to fortify the witness too much. Though the jury were left perfectly free to find whether the witness acted under duress or not, they were furnished with a wrong standard, as we have already shown, by which to decide the question. Their attention should have been called, not to section 2637, but to section 4303 of the code, if to either. In *Williams vs. The State*, 69 *Ga.* 32, the report furnishes no evidence that duress was defined as the presiding judge defined it in the present case. I will add also that this point in *Williams vs. The State*, is not brought out in as full and clear a light as seems desirable. It may be doubted whether, in the argument or the decision of that case, section 4303 of the code was considered.

In recognizing fear, though less than a legal justification, as an explanation of contradictory testimony on two different occasions by the same witness, we do not understand ourselves as going counter to *Pierce vs. The State*, 53 *Ga.* 365; *Stafford vs. The State*, 55 *Ga.* 592, and other like authorities. A timid witness may yield to groundless fears, or fears less powerful than those which the law, for reasons of public policy, exacts as a basis for impunity, and still be worthy of credit when the fear has ceased to operate. Veracity is often more influenced by moral conditions than by legal relations, and the passion of fear is sometimes prone to be extravagant and irrational. There is neither in law nor in philosophy any inconsistency be

tween demanding reasonable fear as an excuse for perjury, and accepting unreasonable fear as an adequate moral explanation of contradictory testimony.

Unreasonable fear is a mistake, a mistake committed by the passions, and while the jury ought to be slow to recognize it, yet when they are certain it is the true explanation, they ought to receive and allow it. How could they do otherwise and render a true verdict? This is according to analogy in other cases, for when contradictory statements are satisfactorily explained in their moral bearings, they are no longer impediments to belief.

4. As a new trial results from what we have ruled touching the charge of the court, we forbear to express any opinion upon the sufficiency of the evidence. There is no material error in any of the other grounds of the motion for a new trial, save in that which relates to the coat and the gun, and it needs no discussion. For the jury, without the knowledge or consent of the prisoner, and without leave of the court, to receive and keep in their room, whilst deliberating on the case, the gun with which the State contends the homicide was committed, and the coat worn by the deceased at his death and pierced with the fatal shot, is unwarranted by law.

Judgment reversed.