### JOHN WHITE v. STATE.

No. A-3486. Opinion Filed Sept. 13, 1921.
Rehearing Denied Nov. 19, 1921.
(201 Pac. 522.)
(Syllabus.)

2.    **Appeal and Error—Time for Objections Below—Taking of Exhib-First Degree.** In a presecution for murder, evidence held to sustain a conviction of manslaughter in the first degree.

2.    **Appeal and Error—Time for Objections Below—Taking of Exhi-its to Jury Room.** An assignment of error based upon alleged misconduct on the part of the jury and bailiff in taking certain exhibits, articles of clothing offered in evidence, with them to the jury room, where no objections were made, cannot be con-

sidered by the appellate court, where the matter was first brought to the attention of the trial court on a motion for new trial.

3. **Appeal and Error—Contents of Record—Rulings Incorporated in Agreed Statement Supporting Motion for New Trial.** The incorporation of rulings or statements of the court, made during the trial in an agreed statement by counsel, in support of a motion for new trial, do not make them proper matter of exception in the record, unless such agreed statement is signed by the trial judge as a bill of exceptions.

4. **Trial—Taking Exhibits to Jury Room not Error.** It is not error for the jury to take to the jury room, on their retirement, certain exhibits introduced in evidence for the purpose of inspection, where it did not appear that they were used by the jury in a manner inconsistent with the testimony.

Appeal from District Court, Cotton County; Cham Jones, Judge.

John White was convicted of manslaughter in the first degree, and he appeals. Affirmed.

Morris & Wells and J. W. Brooks, for plaintiff in error.

S. P. Freeling, Atty. Gen., and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, P. J. The plaintiff in error, John White, was tried in the district court of Cotton county upon an information for the murder of Frank Horton. The jury by their verdict found him guilty of manslaughter in the first degree, and assessed the punishment at seven years in the penitentiary. From the judgment rendered in pursuance of the verdict he appeals.

The deceased lived about 10 miles south of Temple on a farm. On the date alleged, between 5 and 6 o'clock in the evening, he was planting cotton near the east and west section line when the defendant walked up the road from his home about half a mile east and shot and killed the deceased.

The evidence showed that one bullet entered the left side between the ninth and tenth ribs, about five inches to the left of the spine; another entered a little below and a little nearer the spine; and one entered the left arm; and another near the wrist.

Gus Allen, the first witness for the state, testified:

"Frank Horton lived on the east 80 acres of the quarter section I lived on. I was planting some squash seed in the yard about half past 5, and I heard a gun fire and a man hollered. I looked and saw a man standing with smoke in front of him. The gun fired again and the man hollered again, and after that I heard only the report of the gun, two or three times. The man that fired the shots ran east along the section line towards John White's house. I ran down there as quick as I could, and found Frank Horton lying on his right side, his face to the west. I raised his head but could not see any sign of life. His feet were about 6 feet from the fence and his head about 12 feet. His team and planter were 12 steps north of the body. There was a little pair of pinchers and a pocket-knife in his pockets, also a pocketbook. About 10 feet north of the body, towards the planter, there was a little monkey-wrench on the ground."

The shirt, underwear, and overalls worn by the deceased at the time were introduced in evidence. Three or four witnesses testified that they made an examination of the ground where the body was found, and picked up a bullet a few inches from the left arm of the deceased, and the next morning another bullet was found four or five inches from where the first bullet was found.

Johnny White testified:

"I was 16 years old the 4th day of last October. Me and my brother Charley were fixing the fence at Horton's corner that afternoon. The bottom wire was broken, and we were stretching it with a two by four we found laying on the ground. It had been used for a prop for the west post

of Mr. Horton's gate. Mr. Horton came and asked us which one of us got it.. I told him I did. He said one of us had been getting it every time we came by there, and I told him whoever said I did lied. He said he was going to get over and kick me all over the lane and if he ever caught me on the place he would kick me off of it. When Papa came home, I told him that Mr. Horton ran on to us about the post. He asked what did he say. I said he did not say much of anything, and Papa said, 'You want to leave Mr. Horton alone,' and I went on to work."

Charley White testified:

"I will soon be 19. My sister Pearl ran to the house and said, 'Mr. Horton is killing Papa.' I walked up the lane and met Papa. I asked him what he had done, and he said: 'I have killed Mr. Horton. You go across to Mr. Varner and tell him where the monkey-wrench was.' I ran across to Mr. Varner and told him that Papa wanted him to see about the monkey-wrench that was pretty close to Horton."

As a witness in his own behalf, the defendant testified:

"I was 44 or 45 on the 26th day of last July. I went to Byers that morning. My wife was with me and I took my gun along. We got back home about noon. My baby boy said something about Johnny and Mr. Horton having a racket. I never paid any attention to it. Some boys came along and asked for my seine. I told them they could have it, and after dinner I followed them down to the river. I sat there a while watching them seine. Then I went up in the field where the boys were at work. I asked Johnny about the racket he had with Mr. Horton. He said there was nothing to it only Mr. Horton got mad over a plank. I said, 'I want you boys to let Mr. Horton alone.' Then I want out in the cotton patch and fixed the disk on the go-devil. When I came back to the house it was getting something like sundown. My wife came around, and I said: "Get supper. I am hungry.' I put my hat on and thought I would go up the road and see if there were any posts down. It is a half mile from my house to where Horton was. When I got about

half way, I put up a wire that was down and walked on a little piece. I noticed Mr. Horton had turned his team around and stopped, so when I got close to him he hollered to me to come over, that he wanted to talk to me, and I says: '1 haven't got time this evening. I will be over in the morning.' He said, 'You blue-eyed son of a bitch, if you don't come to me, I will come to you.' I was in the center of the road, I says, 'Mr. Horton, I don't want any trouble with you.' He said, 'No, you never want any trouble, but you let your kids come up the road and go through my field, and you know I don't want them there.' I said, 'I am willing to make that right.' He said, 'You will not do anything you say you will, and you will not make it right.' I said: 'Mr. Horton, you have no right to be mad at me. I never done you any harm in my life.' He calmed down when I told him what I would do about making the boys behave. I walked up to the fence where he was at. We stayed there and talked maybe five minutes. I said, 'If the boys have taken that prop down, I will guarantee that your fence will be put back in proper shape.' 'All right,' he said, 'the fence is not hurt, but there is another thing you remember, don't you?' I said, 'I don't know, what is that?' He said, 'You remember ordering me out of your field when I was hunting?' I said: 'Yes, I hollered to you.' You see I have my place posted. I said, 'You see that sign there on the gate.' He got mad all at once and grabbed me around the shoulders and jerked me into the fence and gave me two or three hard jerks and went with his right hand into his hip pocket. I grabbed him, and we were riding up and down this fence, first one way, then the other, and my holt gave out and be got loose and he cut me with his wrench and struck at me. I dropped back and pulled my pistol out of my right-hand pocket and fired it until it quit shooting. When I fired the last shot at him, he was in a stooping position and he stumbled back and fell. Before I killed him I hollered as loud as I could, I guess I was scared. I walked right back and got about 50 yards when I saw Lon Varner coming. I hollered to him, 'There is a wrench right north of Horton's head, and I want you to watch that wrench.' Varner acted like he did not understand what I said, so when I met my boy Charley

I told him to tell Mr. Varner to notice that wrench. My pistol was a 38 double action. I never put but four cartridges in it. I shot Mr. Horton because I thought he was going to kill me."

Carney Varner testified:

"My age is 15 years. I was up on the big hill and heard Mr. Horton talking loud. I looked down, and Mr. Horton and another man were fighting. I hollered to my father and told him they were fighting over there. I ran further up and I looked again and heard three or four shots. I saw Mr. Horton fall. There was a pause between the first and second shot. Mr. Horton had commenced hollering, and after the shots were fired he fell. It looked to me that one was on one side of the fence and one on the other. They seemed to be scuffling back and forth. That forenoon I fixed the fence near where the killing occurred. Johnny White was with me. Johnny picked up a two by four plank and was trying to stretch the wire with it. Mr. Horton came over to us and asked Johnny which one of us got that prop. Johnny said he did. Mr. Horton told Johnny he had been taking down that prop all year, and Johnny told him that any one that said he had taken it down was a liar, and he told Johnny he was going to get over there and kick him. Then me and Johnny went up to my house."

The testimony covers several hundred pages, but the foregoing statement is sufficient to understand the questions raised.

But two grounds for reversal are relied on: The first is based upon alleged misconduct of the jury and bailiff in taking certain exhibits offered in evidence with them to the jury room.

The record shows that in support of this ground of the motion for new trial there was an agreed statement which recites:

"That in the argument of the case counsel for defense examined the clothing of the deceased and of the defendant, and stated to the jury that he desired that they take this clothing, including the underclothes, shirt, and overalls of the deceased, and the clothing of the defendant introduced in evidence with them to the jury room and put them on and test them out as to wounds, powder burns, or other evidence that might appear on such garments.

"That this argument was made in the presence of and with the consent of the defendant and the court. Counsel further said, 'You will have all these exhibits,' in his remarks just prior to his calling particular attention to the clothing.

"The bailiff in charge of the jury, after having been sworn to take charge of the jury, collected up all the exhibits in the presence of the court and counsel for state and defendant and the defendant himself, and carried them out of the courtroom with him when he took the jury out. The act of bailiff in gathering up the exhibits and carrying them out of the courtroom while with the jury was all done in the presence of the defendant and his counsel, and the counsel for the state, after the court had instructed the jury to begin consideration of the case on the following morning and after having instructed the bailiff that such things as they would want, would be sent them the following morning, and that defendant was never afterward consulted about what exhibits should be sent to them.

"By the Court: No expression of authority was given to the bailiff by the court to deliver the exhibits to the jury."

Other than this agreed statement, there is nothing in the record indicating the rulings or statements of the court. The incorporation of rulings or statements of the court, made during the trial in an agreed statement by counsel, do not make them proper matter of exceptions in the record, unless such agreed statement is signed by the trial judge as a bill of exceptions. However, the question here attempted to be pre-

sented was before this court in several cases and decided adversely to appellant's contentions. In the case of Saunders v. State, 4 Okla. Cr. 264, 111 Pac. 965, Ann. Cas. 1912B, 766, it was held that there was no error in allowing the jury to take with them to the jury room a coat worn by the deceased when he was shot, which was introduced in evidence, where the defendant through his attorney in open court consents thereto. Nor was there any error in some of the jurors putting on the coat in the jury room to observe the location of the bullet holes therein.

In the case of Hopkins v. State, 9 Okla. Cr. 104, 130 Pac. 1101, Ann. Cas. 1915B, 736, it was held:

"Where on a trial for murder, the court permitted the jury to take, on retirement, and to have the same in their possession in the jury room, while deliberating, the defendant's shotgun and the shells and the shot which had been introduced in evidence, and it not being made to appear that they were used by the jury in a manner not consistent with the evidence, it cannot be said the jury thereby received evidence out of court."

In the opinion it is said:

"In the case at bar it cannot be said that the jury received evidence out of court. These articles had been properly identified and received as evidence in the case. Nor can it be said that the jury was guilty of misconduct, such as prevented a fair and due consideration of the case, for them to take with them these articles. No injury is pointed out, and no prejudice to the substantial rights of the defendant appears; and we are of opinion that in the case at bar there was no error in that regard."

The other ground urged in the brief is that the evidence is insufficient to sustain the verdict, and counsel say:

"As we view the case, the defendant was either guilty of murder or nothing, and we contend that under the testimony in the case he was justified."

The theory of the prosecution appears to have been that the killing was an assassination. The defendant sought an acquittal on the ground that he acted in self-defense.

We deem it sufficient to say that we are impressed by the record that the altercation which resulted in this unnecessary homicide was of the defendant's own seeking. We have seldom read a record of conviction where there was less palliating circumstances in behalf of the defendant than this case presents. According to his own statement on the witness stand, and the physical facts, he is guilty of manslaughter in the first degree, and we think he ought to be thankful that the jury dealt so leniently with him.

Finding no error in the record, the judgment of the lower court is affirmed.

MATSON and BESSEY, JJ., concur.