The STATE OF MONTANA, Plaintiff and Respondent, *v.*
LEROY JOHN SCHLEINING, Defendant and Appellant.

No. 10766.
Submitted May 13, 1965. Decided June 23, 1965.
Rehearing denied July 20, 1965.
403 P.2d 625.

William G. Mouat (argued), Billings, for defendant and appellant.

Forrest H. Anderson, Helena, Donald A. Douglas (argued), Helena, Donald J. Beighle (argued), Deer Lodge, G. Page Wellcome, Thomas I. Sabo, Bozeman, for plaintiff and respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

This is an appeal from a conviction of the crime of assault in the second degree after having plead "true" to the charge of a prior conviction. Trial was held in the eighteenth judicial district before the Honorable W. W. Lessley, after a motion for a change of place of trial had been granted by the district court of Powell County.

During the month of April 1962, the appellant was serving a sentence in the State Prison at Deer Lodge, Montana. He was housed in Rothe Hall located several miles outside the main prison. This is the newest maximum security building in the prison complex in which some 240 inmates are housed, 60 to a wing. The inmates of Rothe Hall are classified minimum one, a man who stays at the compound at all times; minimum two is an inmate who under supervision can go outside the steel gate but must be under supervision at all times; and minimum three is a trustee who can go outside the gate unattended. The appellant was on April 28, 1962, a minimum two inmate.

On the evening of April 28, 1962, one of the guards, Frank Marron, was assaulted by several prisoners. He suffered multiple wounds of the head, numerous bruises and contusions of

the body, arms and legs, and because of the blows to the head lost the hearing in one ear. The testimony is clear that the blows that injured Mr. Marron were delivered by two convicts, Sullivan and Walker. The question presented by this appeal is whether the appellant was a participant in a plan to break out of Rothe Hall, which resulted in the assault on Officer Marron.

Two entirely different stories of what happened April 28th were presented to the jury. One, the testimony of the guards, including Mr. Marron, and the other by the inmates Sullivan, Walker, Erickson and the appellant.

The State's case was presented through the testimony of three guards, Marron, Bogut and Ebel and the testimony of two inmates Sullivan and Fowler. According to the guards' testimony all the inmates were to be in bed by 10:00 P. M. with the exception of a clean-up crew and the kitchen crew. The prison rules provided that after 10:00 P. M. there was to be no movement of inmates between wings or floors, but that on the night of the 28th the appellant was up and around after 10:00 complaining that he was having trouble with a leg, and he was given an ointment to rub on it. In addition, Sullivan was up with appellant, helping him to rub the ointment on his leg.

The guards learned shortly after the lights went out that there was to be trouble that night and Sergeant Bogut called the main prison officers to get help in as much as there were only three unarmed guards locked up with some 220 inmates. Mr. Marron testified that just before being assaulted that in addition to the appellant and Sullivan being up and dressed, inmates Walker and Erickson were up and in the vicinity of the men's room. Too, that appellant went downstairs without his permission and contra to the rules. At this time, before being informed by Sergeant Bogut that trouble was brewing, Mr. Marron testified that he "felt something was going to happen," and when he was relieved from his post to go downstairs for coffee he told Bogut, who relieved him, of his feeling. After getting coffee and returning to his duty area,

Officer Marron was assaulted by Sullivan, who hit him six or seven times with an iron bar. Sullivan then ran to the stairs leading downstairs and Officer Marron called for help. His testimony as to what happened next was:

"Well, I looked up and inmates Walker and Erickson were on one side of me and inmate Schleining [appellant now] was on the other side.

"Q. What occurred when you looked up and observed these individuals gathered around you? A. Well, I was still screaming for help and inmate Walker picked up a folding chair off the table and started to hit me with it.

"Q. And what position did you occupy at that time? A. I was lying on the floor.

"Q. Were you able to defend yourself? A. I got my arms over my head. * * *

"Q. How many times were you hit with this chair? A. Oh, I'd say at least six, it could be more, he swung quite a few times. * * *

"Q. What occurred at this point? A. I looked up at them and I said, 'There is no use beating me any further, I have had it, there is nothing I can do to stop you.'

"Q. What next occurred? A. And then, inmate Schleining told me to roll over on my belly and he said, 'I am going to tie your hands behind your back.' I said, 'Not this old house, I am not getting on my belly,' and he told me again to roll over on my belly, that he was going to tie my hands on my back and I said 'Not me, I am not getting on my belly,' and he told me again to get on my belly and then I started to sit up and he said, 'Get back on your belly,' he says, 'I am going to tie your hands behind your back.' * * *

"Q. What occurred after this? A. Then, inmate Schleining got my left hand and he had a long piece of cloth in his hand, a strip of it, an inch or so, and he wrapped it around this hand once and then he tied a knot in it and then he reached behind

me and he got this hand and he wrapped it once and started to tie a knot in it. * * *

"Q. What happened after he tied you, would you demonstrate? A. He pulled this hand behind me and then he reached and got his hand and pulled it back and started to tie that hand.

"Q. What occurred at that point? A. Right at that moment inmates Walker and Erickson just turned and started for Dorm Four and inmate Schleining says, 'You are hurt, I am going to help you.' * * *

"Q. What occurred after inmate Schleining said 'You are hurt, I'm going to help you?' A. I says 'Keep your hand off me,' and he said 'you are hurt, I want to help you' and then two other inmates came out of the dorm and he said, 'Come over here and help me carry this man downstairs, he is hurt,' and I told him to keep his hand off me and he called those two inmates over and they picked me up and carried me downstairs."

Concerning the events testified to by Marron the appellant vigorously denied having anything to do with the assault or that he had tried to tie up Marron. He testified that he was using the rest room just off the recreation room, where Marron was assaulted, and that he heard an outcry and a thud as though something heavy had dropped and that when he went to the door he could see a man lying on the floor calling for help. He said he could see that he had a bloody head so he ran to his bunk and got a towel and went to Officer Marron's aid. His version of what occurred is as follows:

"A. I went directly to, went directly to what I now know is Mr. Marron and began to swab his head to see how badly he was injured because he was very obviously injured.

"Q. Was there any conversation between you and Mr. Marron? A. I told him, 'lie still, I am here to help you, and not to hurt you.'

"Q. Did he say anything to you? A. He made no reply. * * *

"Q. Do you know whether he was conscious or not? A. Well at times he was conscious, and then he would fade off into incoherent babbling."

The appellant testified that Officer Ebel saw him helping Officer Marron, but would not come and help him. He did not mention either Walker or Erickson being in the room at any time while he was attending Marron. He denies ever trying to tie him up. According to the appellant he had to go into the dormitory and get inmates Fowler and Ameline to help him carry Marron downstairs.

Officer Ebel testified that when he got upstairs to answer Marron's call for help that two unknown men ran into Dorm Four and that he stopped appellant and asked him where the officer was and that appellant said "I don't know, I haven't seen him."

The State also introduced evidence that during the evening of the 28th, Walker, Erickson, Sullivan and appellant were seen together talking just a short time before the lights were to go off, and that these were the inmates who were up and moving around for one reason or another after the lights went off.

The testimony of inmate Sullivan revealed that there was some plan afoot to break out that night. His testimony concerning what happened was as follows:

"Q. Mr. Sullivan, do you recall the events previous to the assault on Officer Marron? A. Yes.

"Q. Would you state in your own words, what occurred from approximately nine-thirty on that evening? A. I was lying on my bed at nine-thirty reading a book and I suppose about a quarter to ten or fifteen minutes before the lights are out, Jerry Walker came up and tapped me on the foot and asked me to—you know he wanted to talk to me.

"Mr. Mouat—Would you speak up, it is hard for me to hear. A. He wanted to talk to me, so I went over there and he says, 'We are going to escape tonight.'

"Mr. Beighle: Who was there, do you know who was there then? A. Well, there was Beaver, I don't know his full name, Thomas Bell, Jerry Walker, Schleining and myself.

       \*     \*     \*     \*     \*

"Q. After you went over to this area with inmate Walker what occurred? A. I don't know for sure, there was a lot of talking back and forth about whyfores and how and you know, the escape. Actually, I suppose not too much. It seems to have, it seems it was already figured out, but we were just going to converge on the guards, I guess, that would be a way of putting it, and getting the keys and walking out the door and climb the fence and they would go their way and I would go mine."

Certainly, such testimony by one of the inmates who committed the first attack on Officer Marron gave credence to the testimony of inmate Fowler's testimony that around 9:30 he saw these men conferring.

All of the inmates allegedly involved in this escape plan were put into solitary confinement and several weeks after getting out of solitary confinement inmate Sullivan was transferred from the State Prison to the State Hospital at Warm Springs for psychiatric care, and he was a patient at that institution at the time of the trial. The appellant raised an objection to his testimony at the beginning of the trial on the basis of his competency under sections 94-8801 and 93-701-3, R.C.M. 1947.

Dr. Victor O. Fisher, a resident psychiatrist at the State Hospital, and inmate Sullivan's attending psychiatrist testified that Sullivan was capable of understanding the obligations of an oath; that at the time of trial he was capable of giving a fairly correct account of things he had seen or heard; that he has a very good memory and a very good capacity for observation; that he was a person who has schizophrenic reaction, on undifferentiated type, subject to short periods of blackout; that he would have no recall of what happened during a

blackout period, but that except for such a period he could tell graphically what had happened.

Sullivan testified at length and was fully cross-examined by appellant's attorney during which cross-examination he denied appellant's contention that he had signed a statement implicating appellant on the prison authorities' promise to remove him from the prison and put him in the State Hospital.

The appellant upon conviction moved for a new trial which was refused. To the court's refusal to grant a new trial he sets forth six specifications of error which are as follows:

(1) The court erred in giving Instructions Nos. 24, 25, 26, 27 and 28 on conspiracy, and undue emphasis was placed on the matter of conspiracy. These instructions are as follows:

*"Instruction No. 24.* You are instructed that where several parties conspire or combine together to commit any unlawful act, each is criminally responsible for the acts of his associates, or his confederates, committed in furtherance of any prosecution of the common design for which they combine, and irrespective of whether such unlawful act as the objective of the conspiracy was a felony or a misdemeanor. The rule applies although the part the conspirator was to take in the conspiracy was to be executed at a remote distance from the remaining conspirator or conspirators. And the rule extends to the consequences which might reasonably be expected to flow from carrying into effect the unlawful combination, even though they were not intended as a part of the original design or common plan."

*"Instruction No. 25.* Any member of a conspiracy may withdraw from, and thereafter cease to be a party to, the unlawful confederacy, and may thus terminate his liability as to all future acts of the conspiracy, but to accomplish that effect, he must not only cease participation in the conspiracy, but must give notice of his withdrawal to all other members of the conspiracy of whom he has knowledge. Such a withdrawal does not erase his previous participation in the conspiracy, nor re-

10

lieve him of responsibility for the acts of the conspiracy committed while he was a member."

"*Instruction No. 26.* You are instructed that when a conspiracy is once established, every act and declaration of each member, in furtherance of the common design, is, in contemplation of law, the act and declaration of all the members, and may be considered by you as original evidence against each of them; and, for this purpose, it makes no difference at what time a given member enters the conspiracy. He who enters into a combination or conspiracy to do such unlawful act as will probably result in the doing of a more serious unlawful act, must be understood to have intended the consequences which might reasonably be expected to flow from carrying it into effect, and also to have assented to the doing of whatever would reasonably and probably be necessary to accomplish the object of the conspiracy.

"*Instruction No. 27.* You are instructed that although an essential element of a criminal conspiracy is an agreement between two or more persons, and, although the proof must show the existence of such an agreement to support a conviction, the law does not require that the agreement be a formal one, or that it be in writing, or that the persons hold a meeting and expressly state the terms of a common undertaking, or that the agreement be stated in words between them, as men usually express a lawful business agreement. The agreement of criminal conspiracy may come into being through a tacit, mutual understanding, and the wilful, intentional and knowing adoption by two or more persons of a common design, if the other necessary elements of such a conspiracy are present."

"*Instruction No. 28.* You are instructed that where several persons conspire or combine together to commit an unlawful act, each is criminally responsible for the acts of his associates or confederates, committed in furtherance of any prosecution of the common design, although such acts were not intended as a part of the original plan.

"You are further instructed that the least degree of concert of action or collusion is sufficient to make the act of one conspirator, in committing the crime charged the act of all."

(2) The court erred in permitting Dennis Sullivan, an incompetent and insane person to testify.

(3) The court erred in sending the assault weapon (the steel bar) into the jury room during the jury's deliberation.

(4) The court erred in giving Instruction No. 35, and in allowing references to defendant's prior conviction to be heard by the jury before the jury arrived at a verdict on the principal offense with which the defendant was charged. Instruction No. 35 reads as follows:

"You are instructed that every person who wilfully or wrongfully wounds or inflicts grievous bodily harm upon another, either with or without a weapon, is guilty of assault in the second degree, and is punishable by imprisonment in the State Prison for not less than one (1) year nor more than six (6) years. However, when the Defendant is charged with a prior conviction of a felony and such charge is admitted or proven, then second degree assault is punishable by imprisonment in the State Prison for not less than ten (10) years.

"You are also instructed that in this case the Defendant was charged with the prior conviction of a felony and such charge was admitted."

(5) The court erred in denying defendant's motion for dismissal on the grounds of insufficient proof.

(6) The court erred in refusing to grant defendant's motion for a new trial.

To appellant's specification of error No. 1 we find no prejudicial error requiring a retrial. Admittedly, the five instructions are repetitious in parts and the court was faced with the problem of a number of fact situations that had to be covered. The court could well have made one or two instructions that would have covered the situations brought out by the evidence, but they might well have been difficult for the jury to

have understood. He chose to cover each situation by a separate instruction, and in doing so he was following the law, section 94-7201, subd. 5, R.C.M.1947, which provides in part:

"In charging the jury, the court shall give to them all matters of law which it thinks necessary for its information in rendering a verdict."

Instruction 24 was to cover the evidence that showed appellant had not struck Officer Marron; neither was there evidence that he was present in the room when Sullivan struck the first blows. This instruction was given in State v. Alton, 139 Mont. 479, 365 P.2d 527, and was necessary to substantiate appellant's story that he tried to help Officer Marron and did carry him downstairs to get further aid. It was also necessary to assist the jury in determining whether or not appellant had in fact withdrawn from the conspiracy, if the jury found there was a conspiracy to break out.

Instruction 28 likewise was vital to the jury in determining whether there was a conspiracy to break out and when, if there was one, the appellant became involved. The evidence given by inmates, Sullivan and Fowler, and by the guards, Marron and Bogut, raised the question of whether appellant was in the conspiracy and when he became a part of it; therefore, the necessity for Instruction No. 26.

Instructions 27 and 28 going to the elements of a conspiracy and that one individual need not intend the subsequent acts might well have been combined into one instruction, but counsel here did not offer such an instruction nor did he properly object to the possible cumulative effect of the giving of five such instructions. The only statement appearing being, "I don't like the instructions on conspiracy."

This court is precluded by specific statute from considering the appellant's last-quoted instruction by section 94-7201, subd. 4, R.C.M.1947, which provides, in part: "* * * On such settlement of the instructions the respective counsel, or the parties, shall specify and state the particular ground on

which the instruction is objected or excepted to, and it shall not be sufficient in stating the ground of such objection or exception to state generally that the instruction does not state the law, or is against the law, but such ground of objection or exception shall specify particularly wherein the instruction is insufficient, or does not state the law, or what particular clause therein is objected to. * * *

"* * * [N]o cause shall be reversed by the supreme court for any error in instructions which was not specifically pointed out and excepted to at the settlement of the instructions herein specified * * *."

Too, it is well-settled in this state that if a party is not satisfied with an instruction or instructions proposed to be given, he must submit an instruction which more fully covers the particular matter, or he cannot be heard to complain, unless the instruction given is inherently wrong. State v. Bubnash, 142 Mont. 377, 382 P.2d 830; State v. Powell, 54 Mont. 217, 221, 169 P. 46.

Concerning the appellant's second specification of error, inmate Sullivan's competency as a witness, we find no error in the district court's permitting him to testify. The fact that he was transferred from the State Prison to the State Hospital does not "prima facie" make him an incompetent witness. As has been pointed out, the attending psychiatrist Dr. Fisher and inmate Sullivan were both examined and cross-examined outside the presence of the jury to determine competency. The trial court found, on the basis of the testimony given, that Sullivan could testify. The competency of this type of testimony was before this court in the case of Martin v. Hover, 60 Mont. 302, 307, 199 P. 694, 695, wherein the court said: "We recognize the rule that has heretofore been announced by this court and is uniformly supported by the opinions of other courts, that the testimony of an incompetent person is admissible in evidence if he has sufficient mentality to appreciate the nature and obligation of an oath and is capable of giving a correct

account of the matters which he has seen or heard in reference to the question at issue. The court, upon being satisfied that a witness has such mentality, should allow the testimony to be taken and leave the question of its credibility to the jury, or to the court if the case is tried without jury. State v. Berberick, 38 Mont. 423; see discussion commencing on page 442, 100 Pac. 209, on page 215. It is not to be overlooked, however, that before an incompetent is permitted to testify the court must first satisfy itself that the incompetent person has sufficient mentality to appreciate the nature and obligation of an oath." Anno. 26 A.L.R. 1491.

Prejudice in a criminal case will not be presumed but rather must appear from the denial or invasion of a substantial right from which the law imputes prejudice. Too, the defendant must demonstrate prejudice from the record. State v. Noble, 142 Mont. 284, 384 P.2d 504; State v. Straight, 136 Mont. 255, 347 P.2d 482.

To the appellant's specification of error No. 3 we find no merit.

Whether or not the iron bar was or was not taken to the jury room is a matter of conjecture for it only appears through counsel's affidavit. The matter was raised by counsel at the hearing for a motion for a new trial which was denied by the trial judge. In case it did what prejudice would have arisen sufficient to cause a reversal of this case? The bar had been admitted as a State exhibit, was passed among the jurors and was plainly visible throughout the trial, and no prejudice could have occurred if the jury did have it in the jury room.

In State v. Cates, 97 Mont. 173, 197, 33 P.2d 578, certain exhibits were taken into the jury room according to appellant's counsel, and this court in considering this alleged error said:

"By the provisions of section 12011, Revised Codes 1921, [now R.C.M.1947, § 94-7303] the court may, in its discretion, submit to the jury, during their deliberations, papers, other than depositions, which have been received as evidence in the

cause. In the case of Territory v. Doyle, 7 Mont. 245, 14 P. 671, it was held that, in the absence of a prohibitory statute, the court, in its discretion, could submit exhibits to the jury.

"The exhibits in question here were not among those enumerated in section 12011, supra. No showing was made that there was anything about the particular exhibits which would furnish to the jury any other information than that which had already been obtained from the same article exhibited to them during the trial. We do not think that prejudice can be implied from the fact that these particular exhibits were left in the possession of the jury in the jury room. Our view finds support in the following cases: People v. Herrera, 32 Cal.App. 610, 163 P. 879; State v. Riley, 41 Utah 225, 126 P. 294; White v. State, 20 Okl.Cr. 182, 201 P. 522. We think the foregoing authorities announce the better rule—one in accord with our section 12125 [Rev.Codes 1921, now R.C.M.1947, § 94-8207], which provides that this court must give judgment without regard to technical errors or defects which do not affect the substantial rights of the parties. But authority may be found taking the contrary view. McCoy v. State, 78 Ga. 490, 3 S.E. 768."

The matter contained in appellant's fourth specification of error covers the matter of defendant's prior convictions. The Legislature of Montana in section 94-4713, R.C.M.1947, authorizes the filing of a prior conviction, to which the accused pleads true or not true, and this court in numerous cases has upheld its legality. State v. Nelson, 133 Mont. 300, 322 P.2d 1113; State v. O'Neill, 76 Mont. 526, 248 P. 215.

██ Just how the state could have tried its case, inasmuch as the assault occurred in a prison, and not informed the jury that the participants were prisoners is difficult to understand, but if Montana is to become one of those states described by appellant's counsel "if Montana is to keep pace with what the writer believes to be the just, fair, progressive, forward-looking procedure for alleging and proving a prior conviction"

then we say it must be done by the legislative branch of government and not the judicial.

We have carefully set forth the evidence produced by both sides during trial and find it sufficient to sustain the conviction. At the very least, the jury properly could have found appellant was present during the second assault, he attempted to tie Officer Marron and that he was up and moving around, in violation of regulations, after the lights were out. After all, the weight of the evidence in a criminal matter is for the jury to determine in the first instance.

The fact recital herein does not purport to cover *all* of the incriminating facts and circumstances, but it is deemed adequate to demonstrate that there is evidence to support the jury's determination of guilt when it retired to consider its verdict.

Appellant's last specification of error goes to the court's failure to grant appellant's motion for a new trial based on an affidavit of appellant's counsel concerning the alleged rope used to tie Officer Marron's hands.

Appellant's counsel presented his affidavit and that of Officer Gerald J. Stevens. The latter being the officer that Officer Marron testified had untied his hands. Officer Steven's affidavit states: "That after arriving at Rothe Hall, affiant talked with Frank Marron, the guard who was beaten. Marron was lying on a table or bench in the lower lobby. Affiant asked him how he was and Marron said they beat me. Affiant asked Marron if there was anything he could do for Marron and Marron replied that he would like a cigarette. Affiant gave him a cigarette and lit it for him. A few minutes later affiant helped Marron to the bathroom and bath at Marron's request. Affiant did not untie Marron's hands and does not recall seeing a cloth tape or anything which could have been used to tie Marron's hands. Marron's hands were untied when he gave him a cigarette. Marron's hands were not tied when he was first seen by affiant and affiant did not untie Marron's hands." It

should be noted that Stevens' affidavit shows he did not get to Rothe Hall until about midnight, some time after the assault.

It is well-settled that a new trial will not be granted upon the ground of newly discovered evidence where it appears that such new evidence can have no other effect than to discredit the testimony of a witness at the original trial. It is only when it is shown by competent and satisfactory evidence that appellant would not have been convicted, but for this evidence, that a new trial will be granted for newly discovered evidence. State v. Polich, 70 Mont. 523, 226 P. 519; State v. Poole, 68 Mont. 178, 216 P. 798.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and CASTLES concur.