IN THE SUPREME COURT OF THE STATE OF MONTANA

No. 13011

STATE OF MONTANA

VS.

DUNCAN PEDER McKENZIE

Justice Daniel J. Shea Dissent

March 28, 1980



FILED

MAR 2 8 1980

Thomas J. K━━━

CLERK OF SUPREME COURT
STATE OF MONTANA

Mr. Justice Daniel J. Shea dissenting:

Before setting forth the basis of my dissent, it would perhaps be helpful to place this case in its procedural prospective. This Court decided the first McKenzie case on November 12, 1976. State v. McKenzie (1976), 171 Mont. 278, 557 P.2d 1023. I was not a member of this Court at that time. The case then traveled to the United States Supreme Court on a petition for writ of certiorari.

On July 29, 1977, the United States Supreme Court remanded the case to be reheard in light of Patterson v. New York (1977), 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281. When the case was again orally argued, I was a member of this Court. In addition to addressing itself to the Patterson v. New York issue, this Court again issued a full opinion. Other than the Patterson issue, it was for the most part, simply a repeat of the first McKenzie decision. State v. McKenzie (1978), ____ Mont. ____, 581 P.2d 1205, 35 St.Rep. 759. I dissented to that opinion on the search and seizure question and on the death penalty question (581 P.2d 1235-1277).

THE SEARCH AND SEIZURE QUESTION

I concluded that the searches and seizures in this case blatantly violated defendant's constitutional rights under the Montana and United States Constitutions and therefore that the evidence seized and the fruits of the illegally obtained evidence should have been suppressed. 581 P.2d 1235-1266. Defendant was convicted by the use of illegally seized evidence and was thus entitled to a new trial. My views have not changed on the search and seizure question; indeed, they are even more resolute. This is a very strong case for suppression of evidence. Expressed as moderately as possible, the search and seizure violations which occurred in this case are appalling.

-56-

There is no need, however, to again set forth my dissent in this opinion. My views expressed in the second McKenzie case (581 P.2d 1235-1266) shall constitute my views here on the search and seizure questions. No doubt I could write a stronger dissent, but time constraints do not permit a rewriting. I think it appropriate, however, to comment on one case that we have decided since the second McKenzie case.

In Thomson v. Onstad (1979), ____ Mont. _____, 594 P.2d 1137, 36 St.Rep. 910, this Court unanimously confirmed what my position had always been in relation to Montana law and the requirement that an application for a search warrant must contain probable cause within the four corners of the document itself, without reference to any extraneous oral statements or testimony. This Court reconfirmed the four-corner requirement:

> "However, regardless of whatever additional information Hallett provided to the judge who issued the warrant, the failure to put that information in writing precludes our consideration of whether it might have cured the insufficient affidavit. This Court has previously construed Article II, Section 11 of the 1972 Montana Constitution to require that all the facts relied upon by the issuing magistrate be included in writing in the sworn affidavit. State ex rel. Townsend v. District Court (1975), 168 Mont. 357, 362-63, 543 P.2d 193, 196. See also, United States v. Anderson (9th Cir. 1971), 453 F.2d 174, 177 & n. 3; Petition of Gray (1970), 155 Mont. 510, 520, 473 P.2d 532, 537. Cf. Stone v. Powell, 428 U.S. at 473, n. 3, 96 S.Ct. at 3042, n. 3, 49 L.Ed.2d at 1075, n. 3." 594 P.2d at 1139.

From this quotation there is no doubt that this Court not only considers this to be the law, but also that this has always been the law in this state. These constitutional requirements under both the United States and Montana Constitutions certainly predated the search and seizure involved in this case. For reasons that I am unable to comprehend, this Court has suspended the application of this law to defendant McKenzie here. This was one of the major points of my dissent on the search and seizure questions, and it is why I so meticulously set forth

the facts and circumstances surrounding the search and seizure. 581 P.2d 1235-1266.

We thus arrive at the issuance of the present opinion. This case was again decided because the United States Supreme Court directed us to do so. The Supreme Court ordered us to reconsider it in light of Sandstrom v. State of Montana (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The specific order of the United States Supreme Court provided:

"WHEREAS, lately in the Supreme Court of the State of Montana, there came before you a cause between The State of Montana, plaintiff and respondent, and Duncan Peder McKenzie, Jr., defendant and appellant, No. 13011, wherein the judgment of the said Supreme Court was duly entered on the seventh day of June, 1978, as appears by an inspection of the petition for writ of certiorari to the said Supreme Court and the response thereto.

"AND WHEREAS, in the 1978 Term, the said cause having been submitted to the SUPREME COURT OF THE UNITED STATES on the said petition for writ of certiorari and response thereto.

"ON CONSIDERATION WHEREOF, it was ordered and adjudged on June 25, 1979, by this Court that the judgment of the Supreme Court of Montana in this cause be vacated, and that this cause be remanded to the Supreme Court of the State of Montana for further consideration in light of Sandstrom v. Montana, 442 U.S. _____ (1979).

"NOW, THEREFORE, THE CAUSE IS REMANDED to you in order that such proceedings may be had in the said cause, in conformity with the judgment of this Court above stated, as accord with right and justice, and the Constitution and Laws of the United States, the said writ notwithstanding."

In light of the specific direction to reconsider this case in light of Sandstrom v. State of Montana, I do not know whether this Court was again required to issue a full opinion or simply to rule on the questions raised by the Sandstrom case. Whatever the case may be, the majority issued a full opinion on all issues raised by the defendant, and thus I assume the opinion speaks from the date of decision on all issues decided. If such is the case, I fail to understand why the majority did not consider the search and seizure question again and decide it in defendant's favor. Thomson v. Onstad, supra, requires this result.

The majority opinion ignores any reference to Thomson v. Onstad. Why? The search and seizure violations committed against Thomson are pale beside the violations committed in this case. There is no doubt that this Court has not given the full and fair consideration to McKenzie's claims that his Fourth Amendment rights were violated. Indeed, by its decision it is clear beyond any doubt that the Court has carved out another special McKenzie rule in the law of search and seizure. As to McKenzie, the Fourth Amendment is dead and buried.

THE DEATH PENALTY STATUTES

In the second McKenzie case, I dissented on the question of whether the sentencing statutes and appellate review statutes in existence at the time of the commission of the crimes involved, passed constitutional muster. I concluded that they did not. Undoubtedly, by writing another dissent here on the same question, I could better state my position. Time constraints, however, do not permit me to do so. For this reason, my dissent in State v. McKenzie (1978), ____ Mont. ____, 581 P.2d 1235-1277, 35 St.Rep. 799A-799JJ shall constitute my dissent here on the same question.

I do have a few brief comments, however, in relation to the majority adding the case of State v. Coleman (1979), ___ Mont. _____, 605 P.2d 1000, 36 St.Rep. 1134, in suport of its position on the death penalty. The majority states:

> "In short, we believe that the Montana statutory
> scheme in existence at the time of the crimes
> herein, affords defendant the procedural safeguards
> necessary to protect the substantive rights to be
> sentenced without arbitrariness or caprice. State
> v. Coleman (1979), ___ Mont. _____, ___ P.2d ____,
> 36 St.Rep. ____."

Other than citing Coleman, the statement made is precisely the same as made in the second McKenzie case (581 P.2d at 1229). Coleman has absolutely no application to this case. The question in Coleman was whether the 1977 death penalty statutes could be retroactively applied to crimes committed in 1974. The question

here is whether the general sentencing statutes and general appellate review statutes in existence at the time of the commission of the crimes (January 21, 1974) provided sufficient procedural and substantive protections to satisfy the requirements set forth by the United States Supreme Court. <u>Coleman</u> therefore, lends no support to the death penalty issues presented in this case.

By concentrating in this dissent on the issues raised by the <u>Sandstrom-type</u> instructions used in this case, I do not mean to imply that I agree with all those portions of the majority opinion upon which I have no specifically expressed disagreement by writing a dissent. The simple fact is that the entire opinion is lacking, but I do not have the time to address all of those issues raised. Suffice to say that if ever a case came to an appellate court as a monumental mess, this is it.

I direct the remainder of this dissent to the issue of whether the repeated use of the <u>Sandstrom</u>-type instructions in this case are, beyond a reasonable doubt, harmless error. I do not believe that any appellate court could, under the circumstances of the repeated use of these unconstitutional instructions, declare that the error is harmless. For this reason, I believe that the convictions must be reversed.

In Sandstrom v. State of Montana, supra, the United States Supreme Court held that the presumption that one intends the consequences of his voluntary act is unconstitutional. This Court had not, however, passed on the issue of whether the constitutional error was harmless beyond a reasonable doubt. For this reason the United States Supreme Court did not decide this issue and remanded the case to this Court for our initial consideration. In effect, that is what the United States Supreme Court directed this Court to do in the present case.

In granting Sandstrom a new trial after the constitutional

issue was again argued in this Court, we declared that Sandstrom

was entitled to a new trial because we could not declare beyond

a reasonable doubt that the unconstitutional presumption did

not influence to some degree the decision of the jury. State

v. Sandstrom (1979), ___ Mont. ____, 603 P.2d 244, 36 St.Rep.

2099. In Sandstrom, we also set forth what we considered the

correct test to be for the assessment of constitutional error.

I fail to see how McKenzie should not have the benefit of the

same decision--that is, granting him a new trial. The errors

commited in this case are overwhelming in comparison to the

one unconstitutional presumption which tainted the Sandstrom

conviction and required a reversal and new trial.

THE MAJORITY APPROACH TO CONSTITUTIONAL ERROR ELIMINATES THE
NEED TO INSTRUCT THE JURY ON THE LAW OF THE CASE

In Sandstrom v. State of Montana, the United States Supreme

Court declared that in determining whether constitutional error

in instructions is harmless, an appellate court must review

the instructions as reasonable jurors would view them. 442

U.S. at 514, 99 S.Ct. at 2454, 61 L.Ed.2d at 45. The focus

is clearly on the instructions rather than on the evidence.

Indeed, any other view would ignore the issue. In adopting the

"overwhelming evidence" test here, the majority has totally

eliminated any need to focus on the jury instructions to assess

the possible impact they had on the decision making process of

the jury.

In holding that the unconstitutional jury instructions

constitute harmless error, the majority takes essentially a

four-step approach. The fourth step is the actual application

of the "overwhelming evidence" test for assessing the impact

of constitutional error inhering in jury instructions. The

analysis defies logic.

First, the unconstitutional instructions are analyzed
and the Court determines that a reasonable jury would conclude
the presumptions created are rebuttable rather than conclusive.
Second, the Court declares that even the rebuttable presumptions
are unconstitutional under the rationale of Mullaney v. Wilbur
(1975), 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508, and
therefore that a constitutional error analysis must be undertaken.
I note here, however, that this second step is not necessary.
The United States Supreme Court had already declared in Sandstrom
that similar instructions were unconstitutional regardless of
whether they created conclusive presumptions or rebuttable
presumptions.  The case was sent back here for the sole purpose
of determining whether or not the constitutional error was
harmless.  Third, the majority then decides that the best test
for assessing the impact of constitutional error inhering in
jury instructions is the "overwhelming evidence" test.  Milton
v. Wainwright (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d
1, is cited as authority for application of the "overwhelming
evidence test".  And fourth, the Court then confines itself
solely to an analysis of the evidence (rather than to an analysis
of the unconstitutional instructions) and declares that the
evidence of guilt is overwhelming and therefore the verdicts
must be upheld.  This approach constitutes a total abdication
of our duty, which is to assess the impact of the unconstitutional
instructions on the decision making process of the jury.  It
is not our function to be the fact finder.

This approach to constitutional error obviates the need
to ever instruct the jury on the law, and therefore obviates
the need for the jury to ever follow the law.  All that is
required now, it seems, is that the jury be provided only with
the appropriate verdict forms and a conviction will be sustained
if, in the minds of the majority of an appellate court, the

evidence of guilt is overwhelming. I do not believe the United States Supreme Court could, in good conscience, let this Court get away with this approach to the assessment of constitutional error inhering in jury instructions.

It is not simply that this Court has adopted an entirely unacceptable test for the assessment of constitutional error inhering in jury instructions. Moreover, this Court, in two recent cases, adopted and used a different standard to assess the impact of jury instructions on the ultimate decision of the jury. State v. Sandstrom (1979), ___ Mont. ____, 603 P.2d 244, 36 St.Rep. 2099; State v. Hamilton (1980), ____ Mont. ___, 605 P.2d 1121, 375 St.Rep. 70. No explanation whatsoever is offered for the failure to use the same test in this case.

BY ADOPTING THE 'OVERWHELMING EVIDENCE' TEST TO APPLY TO THIS CASE, THE COURT HAS IGNORED STATE V. SANDSTROM AND STATE V. HAMILTON

In adopting the "overwhelming evidence" test, the majority states:

> "We find nothing in Sandstrom inconsistent with adopting this approach to determing harmless error. In Sandstrom the United States Supreme Court expressly declined to reach the issue of harmless error as an initial matter as the Montana Supreme Court had not ruled on this issue. On remand, we granted a new trial to Sandstrom on grounds unrelated to the overwhelming evidence standard in assessing harmless error." (Emphasis added.)

It is true that the United States Supreme Court did not direct us to follow any particular test in assessing the impact of the unconstitutional instructions on the verdicts of the jury. But it is equally true that we were directed to consider the impact of the unconstitutional instruction on a reasonable jury. How would a reasonable jury view the unconstitutional instruction? We were not freed, as the majority implies here, to confine our analysis to the so-called "overwhelming evidence of guilt", which is precisely what the majority has done.

Nor can I make any sense out of the majority statement that "on remand, we granted a new trial to Sandstrom on grounds unrelated to the overwhelming evidence standard in assessing harmless error." The fact is that on remand we granted a new trial to Sandstrom because, in analyzing the unconstitutional instruction and its possible impact on the jury, we could not declare beyond a reasonable doubt, that the error was harmless. If we applied this standard in deciding the Sandstrom case on remand, why didn't we use the same standard here? Isn't defendant McKenzie entitled to an application of the same test as we used in Sandstrom? If not, why not?

In discussing the impact of the unconstitutional instruction and the test for assessing this impact, this Court stated in the Sandstrom decision on remand:

> "In summary, the issue presented is whether the erroneous instruction constituted harmless error as against the defendant. The instruction reads: 'The law presumes that a person intends the ordinary consequences of his voluntary acts.'
>
> "Before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt. Chapman v. State of California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. In so holding, the Supreme Court in Chapman reaffirmed its holding in Fahy v. State of Connecticut (1963), 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173: '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.
>
> "Under Fahy and Chapman, unless we can find harmless error, the conviction must be reversed. To constitute harmless error, we must be able to assent as a Court that the offensive instruction could not reasonably have contributed to the jury verdict. In considering the instruction, and the fact that intent was the main issue in the District Court trial we cannot make that assertion. The erroneous instruction goes to a vital element of the proof of the crime, namely the intent of the defendant Sandstrom in committing the homicide. If the jury followed the instruction, it would have presumed the intent without proof beyond a reasonable doubt." (Emphasis added.) 603 P.2d at 245, 36 St.Rep. at 2100.

It is patently clear that in Sandstrom, this Court used a different test for measuring the impact of constitutional error than what the majority has used in the present case. Furthermore, the Court in Sandstrom focused on the instruction itself. Thus the statement: "If the jury followed the instruction it could have presumed the intent without proof beyond a reasonable doubt." It is equally clear, furthermore, that the Sandstrom test we applied does not depend upon the quality or quantity of the evidence stacked up against the defendant. Rather, it depends upon the possible effect which the unconstitutional instruction had on the decision making process of the jury. Any other test is not a test for constitutional error inherent in jury instructions.

Even more recently, in State v. Hamilton, supra, this Court applied the Sandstrom test although we affirmed the conviction. (Indeed, I feel now that I was in error in signing the majority opinion declaring the error in Hamilton to be harmless.) In Hamilton, we stated:

> "Recently, this Court has made the following observation: 'To constitute harmless error, we must be able to assent as a Court that the offensive instruction could not reasonably have contributed to the jury verdict.' State v. Sandstrom (1979), ____ Mont. ____, 603 P.2d 244, at 245, 36 St.Rep. 2099, 2100. This statement indicates that the law in Montana as to harmless error is closer to the Harrington test. That is, the appellate court determines the impact of the error upon a reasonable jury. If the impact of the instruction could not have reasonably contributed to the verdict then the error is harmless. That such an approach is correct is emphasized by the United States Supreme Court. They said that the proper analysis of an instruction begins with 'the way in which a reasonable juror could have interpreted the instruction.' 442 U.S. at ____, 99 S.Ct. at ____, 61 L.Ed.2d at 45." 605 P.2d at 1121, 37 St.Rep. at 82-83.
>      1132

This language again leaves no doubt that until the present McKenzie case, this Court believed that its duty in assessing constitutional error inhering in jury instructions, was to analyze and assess the impact of the offending instruction on the decision making process of the jury.

Now, however, in less than two months' time, this Court has, at least for the present case, completely abandoned the _Sandstrom_ and _Hamilton_ test, and replaced it with a meaningless "overwhelming evidence" test. If we are going to change the rules every couple months, we should at least explain why we are doing so by citing the cases we are abandoning or disregarding, and explain why these cases either do not apply or why we choose not to apply them. The failure to follow the test set forth in _Sandstrom_ and _Hamilton_ can only be explained as the carving out of a special and meaningless test for constitutional error to apply to defendant McKenzie. AUTOMATIC REVERSIBLE ERROR CAN BE THE CONSEQUENCE OF THE FAILURE OF STATE APPELLATE COURTS TO FAITHFULLY ADHERE TO THE RULE SET FORTH IN CHAPMAN V. CALIFORNIA

Not long after the United States Supreme Court decided Chapman v. California, Chief Justice Traynor of the California Supreme Court wrote an informative book entitled, _The Riddle of Harmless Error_ (1969), Ohio University Press. His main theme was that the _Chapman_ test for measuring constitutional error is too stringent and that a less exacting standard could and should be adopted without jeopardizing the rights of a defendant. But he also warned state appellate courts that if they did not adhere to the _Chapman_ test it would be supplanted with a rule of automatic reversal. He stressed that the statement in _Chapman_ that "'we cannot leave to the States the formulation of authoritative laws, rules, and remedies designed to protect people from infraction by the States of federally guaranteed rights'" was a sure sign that the Supreme Court demands adherence to the _Chapman_ test. With reference to this quote from _Chapman_, he stated:

". . . That statement is of some import in the light of the Court's latter-day procedural safeguards for criminal defendants. Unless strictly monitored courts not in sympathy with these safeguards could vitiate them by holding their violation harmless. The Supreme Court may have been apprehensive of an easy route to affirmance despite constitutional error, via tests more lenient than the Chapman test and more difficult to monitor. The very stringency of the Chapman test is enough to suggest that unless it is faithfully followed, the Supreme Court will supplant it with a rule of automatic reversal.

"The Chapman test itself comes close to automatic reversal. A court faithful to the Chapman test could hold that the violation of a constitutional right did not contribute to the judgment, and hence was harmless only if it could declare a belief to that effect beyond a reasonable doubt, a belief approaching certainty.. . ." 386 U.S. 43, 44.

If what this Court has done in this case is any indication of the attitude of most state courts toward federal constitutional rights, I can think of no more convincing reason for the United States Supreme Court to adopt a rule of automatic reversal. Unfortunately, it appears that the Supreme Court is in part responsible for this attitude of state courts because of its own failure to adopt an undeviating rule for the assessment of the effect of constitutional error on the decision making processes of a jury. But whatever the test may be, I am confident that the United States Supreme Court will not accept the test and analysis the majority has used in this case.

THE "OVERWHELMING EVIDENCE" TEST AS ADOPTED AND APPLIED HERE, OMITS THE ESSENTIAL INGREDIENT OF ASSESSING THE IMPACT OF THE UNCONSTITUTIONAL INSTRUCTIONS

Out of the void created by the apparent failure or inability of the United States Supreme Court to fashion an undeviating rule for the assessment of constitutional error, the majority here has declared that it is free to adopt any one of three rules that appear to have met the approval of the United States Supreme Court. The choices available are described as follows:

-67-

". . . At least three definable approaches
appear in United States Supreme Court cases:
(1) Focusing on the erroneously admitted
evidence or other constitutional error to deter-
mine whether it might have contributed to the
conviction. e.g., Fahy v. Connecticut (1963),
375 U.S. 85, 54 S.Ct. 229, 11 L.Ed.2d 171;
(2) excluding the constitutional infirmity where
overwhelming evidence supports the conviction
e.g., Milton v. Wainwright (1972), 407 U.S. 371,
92 S.Ct. 2174, 33 L.Ed.2d 1; (3) determining
whether the tainted evidence is merely cumulative
or duplicates properly admitted evidence e.g.,
Harrington v. California (1969), 395 U.S. 250, 89
S.Ct. 1726, 23 L.Ed.2d 284."

The majority cites two law review articles which apparently

support the conclusion that three distinct rules exist for

the assessment of constitutional error. Assessing the Harm-

lessness of Federal Constitutional Error--A Process In Need

of a Rationale, Univ. of Pennsylvania L.Rev., Dec. 1976, Vol.

125, No. 2; Harmless Error, The Need for a Uniform Standard,

St. John's L.Rev., Vol. 53, Spring 1179, No. 3. The majority

neglects to mention, however, that neither article remotely

touches upon the issue of how to treat constitutional error

inhering in jury instructions. The most probable reason is

that the authors of both articles assumed, as most people would

assume, that unconstitutional jury instructions cannot be

treated in the same manner as evidence which has been invalidly

admitted at a defendant's trial.

Assuming, moreover, that Milton v. Wainwright, supra,

sets forth a separate "overwhelming evidence" test for the

assessment of constitutional error, I fail to see how it can

be applied to unconstitutional jury instructions.

In Milton v. Wainwright, the United States Supreme Court

held that an invalidly obtained confession admitted as

evidence was harmless error because three additional confessions

made by the defendant had been validly admitted as evidence.

There, a police officer posing as a fellow prisoner, was

confined in the same cell as the defendant in order to obtain

his confidence, and then illegally obtained the defendant's confession. This confession was admitted as evidence at defendant's trial in violation of his Fifth and Sixth Amendment rights. But the Supreme Court affirmed, holding that because the State had validly admitted three additional confessions, the illegally admitted confession was merely cumulative to the three validly admitted confessions, and thus the constitutional error was declared, beyond a reasonable doubt, to be harmless.

I do not believe that Milton v. Wainwright has any viability in relation to an application to unconstitutional jury instructions. But if the basic analytical approach has any application, an appellate court would then be required to look at all the instructions together to determine if the impact of the unconstitutional jury instructions was somehow nullified or neutralized by additional instructions on the same point which properly stated the law. This approach breaks down, however, because an appellate court would then be placed in the untenable position of declaring that the jury, beyond a reasonable doubt, followed the valid instructions as opposed to the invalid instructions. I doubt that an appellate court would have the temerity to declare that beyond a reasonable doubt, the jury disregarded the unconstitutional instructions and followed only the constitutional instructions in its decision making processes.

Any test for harmless error with relation to unconstitutional jury instructions must minimally involve a consideration of whether the jury was influenced by the unconstitutional instructions. Here, the majority has omitted this analysis in adopting its "overwhelming evidence" test.

In stating its reasons for adopting the "overwhelming evidence" test the majority first declares that this test "addresses the realities of the jury trial to a greater degree

than the others in context of the McKenzie case. . ."
(Emphasis added.)  What does this statement mean?  Is the
Court declaring that a special test must be applied to
McKenzie that would not be applied to other cases involving
unconstitutional jury instructions?  What is so special
about the McKenzie case which requires a special test for
assessing the impact of constitutional error?  The opinion
sheds no light on these questions.

But in the next breath, the Court seems to be adopting
an "overwhelming evidence" test to apply to all cases involving
constitutional error.  This test is preferable, the Court
declares, because "an appellate court should view the case
as a whole in assessing harmless or prejudicial error and
not confine itself to a review of only one component of the
case in artificial isolation, in this case the jury instructions."
Is the Court here adopting an undeviating rule for the
assessment of constitutional error inhering in jury instructions?
If so, why didn't the court overrule State v. Sandstrom, supra,
and State v. Hamilton, where, just a short while ago, we
used a different test for the assessment of the impact of
constitutional error?  Again, the opinion sheds no light on
these question.

I agree that unconstitutional jury instructions should
not be treated as in a vacuum, that is, not assessed in terms
of the evidence and issues existing in the particular case.
Nor does the United States Supreme Court require us to so
consider them.  Essentially, an appellate court has three
choices in viewing the impact of the constitutional error:
to focus exclusively on the unconstitutional instructions
(a clearly unacceptable choice); to focus exclusively on
the evidence (another clearly unacceptable choice and the
one adopted by the majority here); or to focus on the un-
constitutional instructions in relation to the issues and

-70-

evidence existing in the case. In the absence of a rule of automatic reversal for unconstitutional jury instructions, the only meaningful choice is the last.

## AN APPELLATE COURT MUST ASSUME THAT JURORS UNDERSTAND THE LAW AND CONSCIENTIOUSLY APPLY THE LAW TO THE CASE

An appellate court can, in determining whether or not erroneous jury instructions constitute harmless error, view them in three ways. Traynor, The Riddle of Harmless Error (1969), the Ohio University Press, pp. 73-74. Obviously, the impact of an erroneous instruction (or instructions) depends upon the view taken.

Under the first view the appellate court assumes "that a jury understands and faithfully follows the court's instructions." (Id at 73.) This being the case, "any substantial error in an instruction is bound to influence the jury and therefore calls for a reversal." (Id at 73.) This view according to Traynor, is the only respectable view of appellate court can take if the law is to have any meaning at all. Applied to unconstitutional error inhering in jury instructions, this would mean that an appellate court must assume that the jury followed the unconstitutional instructions and thus a reversal would be required.

On the other hand, the opposite view operates on the premise "that a jury in the main is mystified by the legal abstractions in an instruction even when the instruction is not unduly complicated by abtruse language." (Id at 73.) Operating on this assumption, an appellate court could then declare that "errors [in the instructions] would have no more influence on the jury than the instruction itself and hence would ordinarily be harmless." (Id at 73.) Although the majority here has not adopted this position in so many words, it is clear that the adoption of and application of the "overwhelming

-71-

evidence" test to this case is premised on an assumption that jury instructions are nothing more than window dressing. Underlying the court's opinion is an assumption that the jury paid no attention to any of the trial court's instructions, and therefore that the jury could not have paid any attention to the unconstitutional instructions.

The middle ground position operates on the premise that "instructions are indeed mystifying but it is impossible to know whether or not a jury managed to comprehend them." Id at 72. This being the case, "an appellate court is unable to declare a belief one way or the other as to the effect on the verdict of an error in an instruction. Hence the error would ordinarily be deemed prejudicial rather than harmless." Id at 73.

Traynor suggests, however, that the only honorable choice is to assume that juries do understand and follow the instructions.

> "In the absence of definitive studies to the contrary, we must assume that juries for the most part understand and faithfully follow instructions. The concept of a fair trial encompasses a decision by a tribunal that has understood and applied the law to all material issues in the case.. . ." Id at 73-74.

If a jury is not required to follow the law as instructed by the trial court it is freed to decide the case on any basis it chooses as long as the appellate court can, on appeal, make a determination that the verdict is supported by "over-whelming evidence." Obviously, if a jury does not have to follow the law, there is no need to give the law to the jury to follow. This approach has as its bedrock, an assumption that jury instructions are nothing more than window dressing. But if the law is to have any meaning at all the legal system cannot tolerate this state of affairs for it would mean no less than jury anarchy condoned by the judiciary.

-72-

Here, the unconstitutional jury instructions (eight in number) played no role whatsoever in the majority opinion finding harmless error. The majority jumped over the unconstitutional instructions, landed on the "overwhelming evidence" and in the same breath affirmed the convictions. I cannot believe for one moment that the United States Supreme Court would declare this to be an acceptable test for assessing the impact of constitutional error.

Aside from the unconstitutionality of several jury instructions, there is a very real problem existing in this case with relation to the instructions. The instructions were long, confusing, and often contradictory. No doubt much of the confusion was caused by the horrible form in which the charges were filed. This situation alone, absent the unconstitutional instructions, would be sufficient to reverse the case and grant a new trial. My analysis of the jury instructions, however, rests on the assumption that the jury understood (or attempted to understand as best it could) the jury instructions and conscientiously applied them (as best it could) to the issues existing in this case.

THE CHARGES FILED IN THIS CASE

The charges filed in this case, together with the jury instructions attempting to cover the charges involved, permit only one rational conclusion--total confusion. In the context of this case there is no way that one can plod his way through the morass of instructions and determine the processes by which the jury reached its guilty verdicts.

On January 1, 1974, the new substantive crimes code went into effect in this state. The offenses charged in this case were allegedly committed on January 21, 1974, and therefore the crimes were charged under the new criminal code. Perhaps the new code helps to a degree in explaining the confusion surrounding this case.

The charges filed in this case are virtually incomprehensible. Out of a relatively simple fact pattern comes such a scatter gun approach that it would a great amount of time for the best law firm to unravel. At the conclusion of the trial, the trial court instructed the jury in the precise wording of the charges as filed. Instruction 6, State/of the Case. One can appreciate the complexity and intricacy of the charges only by viewing the charges as given to the jury. They read as follows:

"That Duncan Peder McKenzie, Jr., late of the County of Pondera, on or about the 21st of January, A.D. 1974, at the County of Pondera in the State of Montana, committed the crimes charged in the following counts, all at locations in Pondera County, Montana:

"COUNT I: THAT DUNCAN PEDER McKENZIE JR., committed the crime of DELIBERATE HOMICIDE, a felony by purposely or knowingly causing the death of LANA HARDING, a human being; in violation of Section 94-5-101 and Section 94-5-102, R.C.M. 1947.

"COUNT II: THAT DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony, by purposely or knowingly causing the death of LANA HARDING, a human being, while the said DUNCAN PEDER McKENZIE, JR., was engaged in the commission of, or in an attempt to commit, or flight after committing or attempting to commit:

"1. SEXUAL INTERCOURSE WITHOUT CONSENT, a felony, by knowingly having sexual intercouse with the said LANA HARDING, a female not his spouse, without consent, the said DUNCAN PEDER McKENZIE, JR., being a male person; or

"2. AGGRAVATED ASSAULT, a felony involving the use or threat of physical force or violence against the said LANA HARDING by purposely or knowingly causing:

"a. Serious bodily injury to the said LANA HARDING: or

"b. Bodily injury to the said LANA HARDING with a weapon, namely:

"(1) a rope by placing said rope around the neck of the said LANA HARDING: or

"(2) a heavy object, by striking the said LANA HARDING upon her head with said heavy object; or

"that the said DUNCAN PEDER McKENZIE, JR., committed the crime of DELIBERATE HOMICIDE, a felony as above alleged, by purposely or knowingly causing the death of the said LANA HARDING:

-74-

"1. by means of torture; or

"2. by lying in wait or ambush in violation of Section 94-5-101, 94-5-102, 94-5-503, and 94-5-202, R.C.M. 1947.

"Count 3. That DUNCAN PEDER McKENZIE, JR. committed the crime of AGGRAVATED KIDNAPPING, a felony, by knowingly or purposely and without lawful authority restraining LANA HARDING by either secreting or holding the said LANA HARDING in a place of isolation, or by using or threatening to use physical force with the purpose of facilitating the commission, or flight there-after, of the felony:

"1. SEXUAL INTERCOURSE WITHOUT CONSENT, by knowingly having sexual intercourse with the said LANA HARDING a female not his spouse, without consent, the said DUNCAN PEDER McKENZIE, JR., being a male person; or

"2. AGGRAVATED ASSAULT, by purposely or knowingly causing:

"(a) serious bodily injury to the said LANA HARDING; or

"(b) bodily injury to the said LANA HARDING with a weapon, namely:

"1. a rope, by placing said rope around the neck of the said LANA HARDING: or

"2. a heavy object, by striking the said LANA HARDING upon her head with the said heavy object;

"in violation of Sections 94-5-303, 94-5-503, and 94-5-202, R.C.M. 1947, the said LANA HARDING having died as a result of said criminal conduct.

"COUNT 4. That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED KIDNAPPING, a felony, by knowingly or purposely and without lawful authority restraining LANA HARDING by either secreting or holding the said LANA HARDING in a place of isolation, or by using or threatening to use physical force, with the purpose of inflicting bodily injury on the said LANA HARDING or terrorizing the said LANA HARDING, in violation of Section 94-5-303, R.C.M. 1947, the said LANA HARDING having died as a result of said criminal conduct.

"COUNT 5. That DUNCAN PEDER McKENZIE, JR. a male person committed the crime of SEXUAL INTERCOURSE WITHOUT CONSENT, a felony, by knowingly having sexual intercourse with LANA HARDING, a female not his spouse, without consent, in violation of Section 94-5-503, R.C.M. 1947.

"COUNT 6. That DUNCAN PEDER McKENZIE, JR., committed the crime of AGGRAVATED ASSAULT, a felony, by purposely or knowingly causing serious bodily injury to LANA HARDING, in violation of section 9-5-202, R.C.M. 1947.

"COUNT 7. That DUNCAN PEDER McKENZIE, JR. committed the crime of AGGRAVATED ASSAULT, a felony, by purposely or knowingly causing bodily injury to LANA HARDING with a weapon, namely

-75-

"1.  a rope, by placing said rope around the neck of the said LANA HARDING: or

"2.  a heavy object, by striking the said LANA HARDING upon her head with said heavy object;

"in violation of Section 94-5-202, R.C.M. 1947."

From this maze of charges the trial court was expected to properly instruct the jury on the applicable law.  A formidable task to say the least.  Before the case was submitted to the jury for its decision the "charge" of deliberate homicide "by lying in wait or ambush" was dismissed.  Instruction 52 told the jury:

"The charge of Deliberate Homicide by Lying in Wait or Ambush has been dismissed by the Court and you are not to concern yourselves with this charge in Count II of the Information filed against the defendant."  (Emphasis added.)

The issue before this Court on the remand from the United States Supreme Court is whether the unconstitutional Sandstrom-type presumptions contained in at least eight instructions, had any effect on the verdicts of the jury.  That is, did the un-constitutional presumptions play any part in the decision making processes of the jury in reaching its verdicts?  Before an appellate court can uphold the convictions it must be prepared to state beyond a reasonable doubt that the jury verdicts were not affected at all by the use of the unconstitutional presumptions. It is impossible to make this declaration, and for this reason the verdicts must be reversed.

One of the underlying problems in this case which sub-stantially defeats the ability of an appellate court to conduct meaningful review is that it is impossible to determine which path or paths the jury took to each of the convictions.  Here, there were multiple charges and the jury was permitted to adopt one or more theories in finding defendant guilty of each of the offenses.  Inability to determine the paths which a jury took substantially impairs, if it does not make it impossible, the

-76-

ability of an appellate court to declare one way or the other whether the Sandstrom-type instructions entered into the decision making process of the jury.

Of necessity, an analysis of the possible impact of the unconstitutional Sandstrom-type instructions on the jury verdicts, must be based on speculation. Indeed, since the trial court failed to provide a basis by which it can be determined how the jury reached its verdict, it is, in my judgment, sufficient to reverse the case on this basis alone. The benefit of any reasonable doubt as to how the jury reached its verdicts should be given to the defendant, and thus it must be assumed that the jury verdicts were impacted by the unconstitutional jury instructions.

According to the enumerated charges, there were seven separate counts: Count 1, Deliberate Homicide; Count 2, Deliberate Homicide; Count 3, Aggravated Kidnapping; Count 4, Aggravated Kidnapping; Count 5, Sexual Intercourse Without Consent; Count 6, Aggravated Assault; and Count 7, Aggravated Assault. But the charges are even more complicated than this, for within each broad charge of deliberate homicide, aggravated kidnapping, and aggravated assault, are several alternative methods by which the defendant is charged with having committed the crimes. All told, defendant is charged with committing the crimes involved in at least seventeen alternative ways.

The evils inherent in review under these circumstances are compounded by the fact that defendant was charged with (and may have been convicted) of the crime of deliberate homicide "by means of torture"--a nonexistent crime in this state. Furthermore, in both of the aggravating kidnapping counts the additional allegation was thrown in that defendant caused the death of the victim. The death of the victim is not, however, an element of the offense of aggravated kidnapping. It is, rather, an aggravating circumstance which, if found by the court, may result in the imposition of the death penalty absent mitigating circumstances.

-77-

## THE JURY INSTRUCTIONS

The unconstitutional Sandstrom-type presumptions permeate the instructions given to the jury in this case. Instruction 31 sets the general tone by covering in great detail the use of presumptions as a tool in satisfying the proof in relation to the mental element involved with the particular crime. Furthermore, almost every count charged has corresponding instructions whereby Sandstrom-type presumptions are set forth.

In Count 1, Deliberate Homicide, the jury was told by Instruction 33 that the mental element involved could be proved by use of these Sandstrom-type presumptions. Count 2, Deliberate Homicide, involves essentially the invocation of the felony-murder rule, charging that defendant committed the homicide while committing, attempting to commit, or in withdrawing from the felonies of sexual intercourse without consent or aggravated assault. By Instruction 37, the jury was told that the element involved in sexual intercourse without consent could be proved by use of the Sandstrom-type presumptions. By Instruction 38, the jury was told that the mental element involved in aggravated assault could be proved by use of the Sandstrom-type presumptions. A more detailed analysis will follow in another section of this dissent.

In Count 3, Aggravated Kidnapping, Instructions 37 and 38, supra, also have a direct bearing on this charge. Defendant was charged with aggravated kidnapping while attempting to commit, committing, or withdrawing from the felonies of sexual intercourse without consent or aggravated assault. Thus Instruction 37, mental element in relation to sexual intercourse without consent, and instruction 38, mental element in relation to aggravated assault, must also be applied in the context of this charge of aggravated kidnapping. Again, the Sandstrom-type presumptions are involved. A more detailed analysis will follow in another section of this dissent.

-78-

The only count which <u>possibly</u> was not impacted by the unconstitutional <u>Sandstrom</u>-type instructions is Count 4, Aggravated Kidnapping.  It <u>appears</u> that a jury could have fought its way through the maze of instructions and not used any of the <u>Sandstrom</u>-type presumptions to determine defendant's guilt under this count.  But because of the deficient jury verdict forms, an appellate court does not know if the jury found defendant guilty of Count 4.  Thus an appellate court would have to speculate that the jury did in fact convict defendant on Count 4 before it could undertake an analysis of the effect of the unconstitutional <u>Sandstrom</u>-type presumptions on the ultimate determination of guilt.  A more detailed analysis will follow in another section of this dissent.

Count 5 charges sexual intercouse without consent, and Instruction 37 directs the jury to use the <u>Sandstrom</u>-type presumptions to find proof of the mental element involved. Counts 6 and 7 charge aggravated assault in alternative ways, and Instruction 38 applies to both counts and directs the jury to use the <u>Sandstrom</u>-type presumptions as proof of the mental element involved.

<u>VERDICT FORM INSTRUCTIONS AND VERDICT FORMS</u>

In seeking to explain the maze of charges to the jury, the trial court attempted to put them in some kind of perspective by explaining in Instruction 6, Statement of the Case, the number of counts, and the number of potential convictions:

> "Although defendant is charged with two counts in each of the offenses of Deliberate Homicide, Aggravated Kidnapping and Aggravated Assault, only one offense of Deliberate Homicide and one offense of Aggravated Kidnapping and one offense of Aggravated Kidnapping and one offense of Aggravated Assault are involved in this case.  <u>Leave was granted the State of Montana to charge in this manner, and to also charge the offense of Sexual Intercourse Without Consent, in order to meet the problems of proof that arise when an offense or offenses can be committed in different ways, or by different means, or for different purposes.</u>

"The defendant can be convicted or acquitted
on any or all of said offenses as you may find
the allegations in each of said counts proved
or not proved, but in no event may be sentenced
for more than one offense of Deliberate Homicide
and more than one offense of Aggravated Kidnapping
and more than one offense of Aggravated Assault
even though you may find both of the counts with
which he is charged to have been proved beyond a
reasonable doubt." Instruction 6. (Emphasis added.)

By this instruction it is clear that the jury was free to find defendant guilty of both counts of deliberate homicide (Counts 1 and 2). Furthermore, the jury was free to find defendant guilty on both counts of aggravated kidnapping (Counts 3 and 4). The jury was free to find defendant guilty on both counts of aggravated assault (Counts 6 and 7). The court stated: "The defendant can be convicted or acquitted on any or all of said offenses. . ." Instruction 6. (Emphasis added.)

But even Instruction 6 is misleading as to the number of charges, for the defendant was charged with many alternative ways. Count 1 charges only one method of having committed deliberate homicide. But Count 2 alleges that the deliberate homicide was committed in at least five alternative ways. One of the allegations within Count 2 is that the homicide was committed under circumstances which would call for the application of the felony-murder rule provided for in section 94-5-102(1)(b), R.C.M. 1947. The felonies allegedly committed were sexual intercourse without consent or aggravated assault.

The deliberate homicide charges contained in Count 2 are further complicated by the allegation that the homicide was committed "by means of torture" or "by lying in wait or ambush." Indeed, neither death caused "by means of torture", or death caused as a result of "lying in wait or ambush", is an element of the crime of deliberate homicide. Rather, each of these elements is an aggravating circumstance under section 94-5-105, R.C.M. 1947, whereby the death penalty may be imposed upon a finding of

the existence of that circumstance, unless the sentencing court finds mitigating circumstances. Notwithstanding this rather fundamental fact, the State charged defendant with a substantive offense of deliberate homicide "by means of torture" and "by lying in wait or ambush" and both were treated thereafter as separate substantive offenses.

Although the charge of deliberate homicide "by lying in wait or ambush" was dismissed before it reached the jury, the charge of deliberate homicide "by means of torture" was consistently treated as a separate substantive offense. The jury was instructed that it was a separate substantive offense, and it appears that the jury found defendant guilty of such charge.

Of all the alternatives available to the jury, there is no way of determining which one or more of the alternative methods the jury used in convicting defendant of deliberate homicide and of aggravated kidnapping. Indeed, the trial court specifically instructed the jury that the verdicts it reached did not have to reveal the path or paths it chose in reaching the verdicts.

With relation to the separate counts of deliberate homicide, the trial court told the jury:

> ". . . even though you may find more than one or more of said charges to have been proved beyond a reasonable doubt, as only one death is alleged, only one Guilty of Deliberate Homicide verdict form is required. . ." Instruction 54, part II—Verdict Forms—Deliberate Homicide.

And, of course, the verdict form returned and signed by the jury, is equally as nonrevealing as to the path or paths taken to reach its verdict:

> "A.  We, the jury in the above entitled cause find the defendant guilty of the offense of Deliberate Homicide as charged.

> "B.  We further find that the Deliberate Homicide was [was not] by Means of Torture.

> "(Strike out the bracketed word or words which do not apply.)"

-81-

The same is true of the aggravated kidnapping charges. It cannot be determined which alternative or alternatives were used in reaching its verdict. The trial court instructed the jury:

> "Since only one Aggravated Kidnapping is alleged, though in different ways and for different purposes, you are to consider all of the charges of Aggravated Kidnapping made against the defendant and even though you may find more than one or all of the charges of Aggravated Kidnapping to have been proved beyond a reasonable doubt you are furnished with only one verdict form upon which to return a verdict of Guilty of Aggravated Kidnapping.
>
> ". . .
>
> "If you adopt the Guilty of Aggravated Kidnapping form you will be required to find on that form whether Lana Harding did or did not die as a result of the Aggravated Kidnapping." Instruction 54, part III-- Verdict Forms--Aggravated Kidnapping. (Emphasis added.)

The guilty of aggravated kidnapping verdict form which the jury adopted and signed, reads as follows:

> "A. We, the jury, in the above-entitled cause, find the defendant Guilty of the offense of Aggravated Kidnapping as charged.
>
> "B. We further find that Lana Harding (did) (did not) die as a result of said Aggravated Kidnapping.
>
> "(Strike out bracketed word or words that do not apply)."

Thus, the trial court's own instructions, combined with the verdict forms he provided to the jury, present a situation on appeal where the appellate court has no way of determining the theory or theories used by the jury in finding defendant guilty of deliberate homicide and in finding him guilty of aggravated kidnapping. It is impossible to say, under these circumstances, that the Sandstrom-type presumptions did not figure in the decision making processes of the jury. For this reason alone, an appellate court should declare that under these circumstances constitutional error will be presumed to have affected the decisions of the jury. Accordingly, the convictions should be reversed.

The jury could have, furthermore, failed to unanimously agreed to any single theory or set of theories in arriving at its decision. If this is the case defendant was deprived of his constitutional right to a unanimous jury verdict. Montana Constitution, Art. II, §26; section 95-1901, R.C.M. 1947. As stated in United States v. Gipson (1977), 553 F.2d 453, 457:

> "The unanimity rule thus requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged. Requiring the vote of twelve jurors to convict a defendant does little to insure that his right to a unanimous jury verdict is protected unless this prerequisite of jury concensus as to the defendant's course of action is also required." 553 F.2d at 457-458.

In reversing a defendant's conviction because the court was not able to ascertain the basis of the jury verdict, the court in Gipson, further stated:

> "During argument, the government admitted, and the record shows that the prosecution presented evidence tending to show that Gipson performed each of these six acts prohibited by 18 U.S.C. §2313. The possibility that the jury may have returned a guilty verdict in the face of a substantial rift among the jurors over the facts in the case, is, therefore, a real one. Because it is impossible to determine whether all of the jurors agreed that the defendant committed acts falling within one of the two conceptual groupings, we cannot say that the district court's instruction was harmless beyond a reasonable doubt under Chapman v. California, 1967, 386 U.S. 18, 87 S. Ct. 824, 17 L.Ed.2d 705." 553 F.2d 459.

Here, defendant was charged alternatively under two broad theories: (1) Deliberate homicide with the element required of "knowingly or purposely"; (2) Deliberate homicide under the felony murder rule where the state does not have to prove the mental element of "knowingly or purposely." Conceivably the jury could have avoided the Sandstrom-type presumptions by taking the felony-murder route to its verdict. But since there is no way of knowing that the jury did take this route, the rule of Chapman v. California, cited in Gipson, above, requires that the deliberate homicide conviction be reversed. Furthermore, because one cannot state beyond a reasonable doubt that the jury followed a constitutional path in reaching the aggravated·kidnapping verdict, it too, must be reversed.

-83-

Analysis of the impact of the unconstitutional Sandstrom-type instructions should not have to proceed beyond this point. Where the path or paths the jury took to its verdict cannot be determined beyond a reasonable doubt, any analysis of the path or paths it could have taken, is pure speculation. Nonetheless, because the majority has omitted entirely any analysis of the unconstitutional instructions in relation to their possible use by the jury in reaching its verdicts, I will do so. First, I will discuss the deliberate homicide conviction, and second the aggravated kidnapping conviction.

DELIBERATE HOMICIDE--IMPACT OF THE SANDSTROM-TYPE INSTRUCTIONS ON THE DELIBERATE HOMICIDE CONVICTION

As I previously stated, at some point before the case reached the jury for its deliberations, the charge of deliberate homicide "by lying in wait or ambush" was dismissed (see Instruction 52, supra). However, the so-called charge of deliberate homicide "by means of torture" remained for the jury's decision.

I must digress at this point to a vitally important and fundamental fact. Defendant was charged with deliberate homicide "by means of torture", the jury was instructed that it was a separate offense, and instructions were given defining this so called offense. Furthermore, there is a reasonable likelihood that the jury may have convicted him of this offense. If this is so, defendant has been sentenced to death for a crime which does not exist in the statutes of this state.

The statute defining deliberate homicide at the time of the alleged crimes in this case, is section 94-5-102, R.C.M. 1947. The entire statute reads as follows:

"94-5-102. Deliberate homicide.

"(1) Except as provided in section 94-5-103(1)(a), criminal homicide constitutes deliberate homicide if:

"(a) it is committed purposely or knowingly; or

"(b) it is committed while the offender is engaged in or is an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, sexual intercourse without consent, arson, burglary, kidnapping, felonious escape or any other felony which involves the use or threat of physical force or violence against any individual.

"(2)   A person convicted of the offense of
deliberate homicide shall be punished by death
as provided in section 94-5-105, or by imprisonment
in the state prison for any term not to exceed one
hundred (100) years."

There is no other statute which creates or defines deliberate
homicide.   It is readily apparent that deliberate homicide "by
means of torture" is not a substantive crime.   It is, however,
one of the statutory list of circumstances which, if found by
the court after a conviction of deliberate homicide, may justify
the imposition of the death penalty, absent mitigating circum-
stances.   Section 94-5-105, referred to in section 94-5-102(2)
above, provides as follows:

"94-5-105.   Sentence of Death for Deliberate Homicide.

"(1)   When a defendant is convicted of the offense of
deliberate homicide the court shall impose a sentence
of death in the following circumstances, unless there
are mitigating circumstances:

"(a)   The deliberate homicide was committed by a
person serving a sentence of imprisonment in the state
prison; or

"(b)   The defendant was previously convicted of
another deliberate homicide; or

"(c)   The victim of the deliberate homicide was a
peace officer killed while performing his duty or

"(d)   The deliberate homicide was committed by means
of torture; or

"(e)   The deliberate homicide was committed by a
person lying in wait or ambush; or

"(f)   The deliberate homicide was committed as a
part of a scheme or operation which, if completed,
would result in the death of more than one person."
(Emphasis added.)

It is abundantly clear that the prosecutor mistakenly
charged defendant with deliberate homicide "by means of torture"
or "by lying in wait or ambush" when there was no statutory
basis to charge him with such as a substantive crime.   Nonethe-
less, there is a reasonable chance that the jury may have
convicted defendant of this so-called offense.

In the verdict form instructions (Instruction 54, Part
II, Verdict Forms--Deliberate Homicide) the trial court told
the jury:

"If you adopt the Guilty of Deliberate Homicide
verdict form you are asked to find on that form
whether the Deliberate Homicide was or was not by
Means of Torture as this is the most serious of
the remaining charges of Deliberate Homicide made
against the defendant.

"After you have reached a verdict on the charges
of Deliberate Homicide, whether Guilty or Not
Guilty, you are still required to return a verdict
on the charges of aggravated Kidnapping. Have your
foreman date and sign the verdict form upon which
you agree on the charges of Deliberate Homicide and
take up the Charges of Aggravated Kidnapping."
Instruction II, Verdict Forms--Deliberate Homicide.
(Emphasis added.)

The verdict form required the jury to use a two-step process
in its decision. First, the jury was to determine whether or
not defendant was guilty of the offense of deliberate homicide
(without reference to any theories or theories used in arriving
at this decision). (Part A, jury verdict form, supra.) Second,
the jury was then to determine whether the homicide was committed
"by means of torture" (Part B, jury verdict form, supra).

It appears that the verdict form contradicts Instruction
54, part II. Instruction 54, Part II, told the jury to first
determine if defendant was guilty of the substantive offense
of deliberate homicide "by means of torture". On the other hand,
the verdict form simply requires the jury to first find defendant
guilty of deliberate homicide, and contains no reference to the
theory or theories by which the jury could reach this result.
Second, upon a determination that defendant was guilty of
deliberate homicide the jury was then to determine whether the
offense was committed "by means of torture." Furthermore, it
appears that Instruction 54, Part II, above contradicts Instruc-
tion 6, supra. In any event, one can safely say that these
instructions give no clear indication as to the path or paths
the jury took in reaching its verdict.

Count 1 of deliberate homicide, alleged that defendant
"knowingly or purposely" caused the death of Lana Harding. This

allegation was made on the basis of section 94-5-102(a). On the other hand, part of the allegations under Count 2, deliberate homicide, were predicated upon the felony-murder rule provided for in section 94-5-102(b). This subsection of Count 2 alleged at least two ways in which the defendant committed a felony murder: either sexual intercourse without consent, or aggravated assault. The felony of aggravated assault was further divided into alternative methods of commission.

Instruction 22 provided the basic definitions of deliberate homicide as charged in Count 1 and as charged in a portion of Count 2. This instruction is a verbatim statement of section 94-5-102(a) and (b). This instruction is legally sufficient. But a real wrinkle is thrown into a portion of the Count 2 charges because the additional charge is made that the deliberate homicide was committed "by means of torture." In filing the charges and by the instructions, this deliberate homicide "by means of torture" was treated as a separate substantive offense.

Instruction 23 attempts to define the purported separate offense of deliberate homicide "by means of torture." It provides:

> "Deliberate Homicide by Means of Torture insofar as we are concerned with the definition thereof in this case is:
>
> "Whoever purposely assaults another physically for the purpose of inflicting cruel suffering upon the person so assaulted for the particular purpose of enabling the assailant to either:
>
> "(a) extort anything from such a person;
>
> "(b) or to persuade such person against his or her will, or
>
> "(c) to satisfy some other untoward propensity of the assailant,

"and in so doing the assailant causes the death
of the person he assaults, in the law is guilty
of the offense of Deliberate Homicide by Means
of Torture, whether or not it was the purpose or
intention of the assailant to cause such death.

"'Untoward propensity' means any perverse, wrong,
bad or corrupt inclination or tendency." Instruction
23--Deliberate Homicide By Means of Torture Defined.)

There is absolutely no statutory basis for the language used in Instruction 23 attempting to define the crime of deliberate homicide "by means of torture." I do not know where the trial court found these definitions. Instruction 34, Methods of Proof Applicable to Deliberate Homicide by Means of Torture, not only repeats most of the language contained in Instruction 23, above, but also attempts to set forth the methods by which the element of this offense can be proved. The trial court specifically told the jury that since a particular purpose had to be proved, presumptions could not be used to prove the mental element involved. The last paragraph of the instruction provides:

"And if you find one or more of said particular
purposes to have been proved beyond a reasonable
doubt and that the defendant killed her while
purposely so inflicting cruel suffering upon her,
he has committed the offense of Deliberate Homicide
by means of Torture, whether it was or was not his
purpose or intention to kill her." (Emphasis added.)

I will have more to say concerning this instruction but presently it is sufficient to state that any analysis of the impact of the Sandstrom-type instructions must start out with the recognition that there is no crime in this state entitled deliberate homicide "by means of torture." One cannot tell whether or not the jury actually convicted defendant of this crime. But even if there is a reasonable chance, the conviction must be reversed for this reason alone, the Sandstrom-type instructions notwithstanding. Minimum standards of due process of law cannot tolerate a reasonable chance that defendant may have been convicted of and sentenced to death for a crime that does not exist.

-88-

For purposes of a _Sandstrom_ analysis however, I will operate on the assumption that whether or not there is a substantive crime of deliberate homicide "by means of torture", is not an issue.

I start this analysis with what I believe is a required premise: unless an appellate court can declare beyond a reasonable doubt that the jury took a constitutional path to its deliberate homicide verdict (thereby avoiding application of the unconstitutional _Sandstrom_-type instructions), the conviction must be reversed. I see no other respectable way to approach the problem of constitutional error inhering in jury instructions.

Instruction 31 set the stage for all the _Sandstrom_-type presumptions which were to follow. It went into great detail as to how the mental element is proven in a criminal case. Part 2 of Instruction 31 specifically sets forth the _Sandstrom_ type instructions and tells the jury how it is to use them:

> "2. _Proof by Presumption of Law._ (Deductions which the law expressly directs you to make from particular facts):
>
> " . . .
>
> "[T]he law presumes, that is, the law expressly directs the jury to reason: That an unlawful act was done with an unlawful intent and also that a person is presumed to intend the ordinary consequences of his voluntary act.
>
> " . . .
>
> "Further, unless you are otherwise instructed with regard to a particular presumption, all presumptions are rebuttable; that is, they may be controverted and overcome by other evidence."

The trial court then zeros in on the particular offenses charged. Instruction 33, entitled _Method of Proof Applicable to the Offense of Deliberate Homicide_, sets forth two of the _Sandstrom_-type presumptions. The first presumption declares that:

> " . . .the law presumes that an unlawful act was done with an unlawful intent; that is, the law expressly directs you to reason from such unlawful act that the defendant acted with unlawful intent or purpose."

Thus, by this presumption, if the jury found that defendant either assaulted the victim or injured the victim, it was directed to find that defendant had an unlawful intent. The trial court also told the jury that this was a rebuttable presumption.

Instruction 33 takes another step and sets forth another unconstitutional presumption that would fall within the proscription of Sandstrom v. State of Montana:

> ". . . if you find . . . that the defendant, . . . voluntarily and unlawfully assaulted or injured Lana Harding, and if you further find beyond a reasonable doubt that the death would result as the ordinary consequence of such an assault or injury, the law presumes that, and expressly directs you to reason therefrom that the defendant intended to cause said death regardless of whether or not he actually had such an intent or purpose."

The trial court further instructed the jury that this also is a rebuttable presumption.

These fatal Sandstrom-type instructions were again drilled home to the jury by Instruction 38, Methods of Proof Applicable to the Offense of Aggravated Assault. The trial court told the jury:

> "Since the offense of aggravated assault may be committed either knowingly or purposely, the offense may be proved by showing the act was knowingly done, and the lega presumption that: 'An unlawful act was done with an unlawful intent, and the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act,' can be used to prove the mental state of knowingly."

> "Therefore, if you reason from facts proved in the evidence . . . that the defendant . . . unlawfully caused Lana Harding bodily injury either with or without a weapon, the law expressly directs you to reason therefrom that he acted with unlawful intent that is purposely; and if you further reason from facts beyond a reasonable doubt that the harm inflicted by him was such as ordinarily results from an act such as defendant's the law expressly directs you to reason that he intended the consequences of his act."
> Instruction 38.

The trial court also told the jury that these presumptions are rebuttable. (Instruction 38 becomes important when construed along with Instruction 34, which analysis will be set forth later in this dissent.)

Instruction 34 contains the methods of proof for the nonstatutory offense of deliberate homicide "by means of torture." The jury is specifically told that the particular purpose or purposes which must be proved under this charge, cannot be proved by presumptions, but only inferences can be used. The trial court tells the jury that the specific purpose to inflict "cruel suffering" (also a nonstatutory term), can be found by the use of inferences only. The trial court also defines the term "cruel suffering" (again a nonstatutory definition). It appears that the essence of this instruction is the direction to the jury that defendant is guilty of deliberate homicide "by means of torture" if the jury finds that he "had purposely assaulted" Lana Harding and inflicted "cruel suffering" and that the defendant had the particular purpose to inflict "cruel suffering" by his assault. (Emphasis added.)

These instructions are exceedingly confusing, misleading and inconsistent. Nontheless, I must assume that the jury understood Instructions 31, 33, 34, and 38, or at least did its best to follow the instructions. The question then arises: By which process did the jury reach its verdict that defendant was guilty of deliberate homicide? It appears that the jury could have taken several paths, and that only one of the paths might not have been affected by the unconstitutional Sandstrom-type presumptions. Unless an appellate court can determine beyond a reasonable doubt which path the jury chose, it is in no position to declare that a jury chose the constitutional path and ignored the unconstitutional paths.

Instructions as to the use of jury verdict forms give some clue with relation to the steps taken in reaching the verdict, but not to the path or paths which the jury followed. Instruction no. 54, Verdict Forms and Instructions As to Their Use, stated in the introduction:

-91-

"In order to return a verdict, all twelve jurors must agree to the decision, including the additional findings you are asked to make on the Guilty of Deliberate Homicide verdict form and on the Guilty of Aggravated Kidnapping verdict form." (Emphasis added.)

This can be interpreted as requiring that the jury first determine whether or not defendant is guilty of deliberate homicide and then to determine if the homicide was committed "by means of torture."  Instruction 54, Part II, Verdict Forms--Deliberate Homicide provides additional support for this two-step process.

Instruction 54, Part II, provides in relevant part:

". . . as only one death is alleged, only one Guilty of Deliberate Homicide verdict form is required.

". . .

"If you adopt the Guilty of Deliberate Homicide verdict form you are asked to find on that form whether the Deliberate Homicide was or was not by Means of Torture as this is the most serious of the remaining charges of Deliberate Homicide made against the defendant."

Again, a two step process is clearly indicated by this instruction.

When combining the two step process set forth in the verdict form with these instructions, a reasonable conclusion is that the jury first reached its decision that defendant was guilty of deliberate homicide and then found in the second step that the deliberate homicide was committed "by means of torture." It remains a mystery, of course, which path or paths the jury took in finding defendant guilty of deliberate homicide.  There are, however, several more obvious possibilities.  If one assumes that the jury followed this two step process in reaching its verdict, the probabilities are clearly in favor of the conclusion that the jury's verdict was tainted by use of the Sandstrom-type instructions.

Count 1 charged defendant with "knowingly or purposely" causing the victim's death.  Instruction 31 told the jury that a voluntary act could be proved by the use of Sandstrom-type

presumptions. Instruction 33, Part II, specifically told the jury that the mental state required for proof of deliberate homicide could be proved by use of Sandstrom-type presumptions. Thus, if the jury did find defendant guilty of Count 1, an appellate court must assume that the jury reached this verdict by use of the unconstitutional presumptions contained within Instructions 31 and 33.

Several possibilities arise if the jury found defendant guilty of any of the alternative charges contained in Count 2. One of the alternative allegations in Count 1 is that defendant is guilty of deliberate homicide by reason of the application of the felony-murder rule. The State alleged that defendant had attempted, had committed, or was withdrawing from the commission of sexual intercourse without consent, a felony, or aggravated assault, a felony. If the jury followed a strict application of the felony-murder rule and thus found defendant guilty of deliberate homicide, it is possible that its verdict was not tainted by the unconstitutional Sandstrom-type instructions.

The felony-murder rule is set forth in Instruction 22, part (b) (a verbatim recitation of the statute), and in Instruction 33, Part III. Under Instruction 33, Part III, "knowingly or purposely) is not an element of the offense. Technically, the jury was therefore not required to consult or use either Instruction 31 or 33 in reaching a verdict that defendant is guilty under the felony-murder rule. But an appellate court cannot determine whether the jury took this path to its verdict. Surely no appellate court could declare beyond a reasonable doubt that the jury took only the felony-murder route just described as its only path to its verdict.

Furthermore, if the jury took the felony-murder rule path to its verdict (thereby avoiding the use of the unconstitutional presumptions contained in Instruction 33) there is still a

strong chance that it used the unconstitutional instructions contained in Instructions 37 and 38. Assuming the jury determined that defendant was guilty of deliberate homicide by committing, attempting to commit, or withdrawing from the commission of the felony of sexual intercouse without consent, the jury would have been required to use Instruction 37, Methods of Proof Applicable to Sexual Intercourse Without Consent. Instruction 37, part II, specifically declares that proof that the act was "knowingly" committed "can be made by presumption." The Sandstrom-type presumption was set forth as the applicable presumption. Thus a felony-murder verdict in relation to sexual intercourse without consent would still not assure that the verdict was untainted by the unconstitutional presumptions.

The same analysis can be made in relation to a felony-murder conviction under the theory that defendant killed the victim while committing, attempting to commit, or withdrawing from the commission of aggravated assault. Instruction 38, Part II, Methods of Proof Applicable to the Offense of Aggravated Assault, specifically declares that proof that an assault was committed "knowingly or purposely" can be made by the presumptions either that "an unlawful act was done with an unlawful intent", or "the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act." Accordingly, a felony murder verdict in relation to aggravated assault would be tainted by the reasonable possibility that the jury used the unconstitutional presumptions contained in Instruction 38.

Another possibility is that the jury reached its verdict through the path cut in relation to the charge of deliberate homicide "by means of torture." Aside from the fact that such offense does not exist in this state, the State did charge that this offense was committed (Count 2, last paragraph), and the trial court defined the offense for the jury (Instruction 23)

-94-

and set forth the method of proof required for this offense (Instruction 34, supra). Whether the jury took this path, is, of course, another mystery. Assuming that it did however, it could have followed an unconstitutional path or a constitutional path.

Instruction 34 permitted the jury to find defendant guilty of the offense of deliberate homicide "by means of torture" if it found the following elements: (1) That defendant had "purposely assaulted Lana Harding and inflicted cruel suffering" and (2) that defendant had one of the particular purposes to inflict "cruel suffering." The phrase "purposely assaulted" is important in relation to how the jury may have reached its decision.

If the jury first found that defendant "purposely assaulted" Lana Harding, and then found that the particular purpose of the assault was to inflict "cruel suffering" it followed an unconstitutional path. A "purposeful assault" is defined by Instruction 38, Method of Proof Applicable To The Offense of Aggravated Assault. Part II of Instruction 38 specifically directs that the mental element of "purposely or knowingly" is established by the use of the Sandstrom-type presumptions. The trial court specifically told the jury that:

> "Since the offense of aggravated assault may be committed either knowingly or purposely, the offense may be proved by showing the act was knowingly done, and the legal presumptions that: 'An unlawful act was done with an unlawful intent, and the legal presumption that a person is presumed to intend the ordinary consequences of his voluntary act,' can be used to prove the mental state of knowingly.

> "Therefore, if you reason from facts proved in the evidence beyond a reasonable doubt that the defendant . . . unlawfully caused Lana Harding bodily injury either with or without a weapon, the law expressly directs you to reason therefrom that he acted with unlawful intent that is purposely; and if you further reason from facts proved beyond a reasonable doubt that the harm inflicted by him was such as ordinarily results from acts such as defendant's, the law expressly directs you to reason that he intended the consequences of his act." (Emphasis added.)

-95-

The instruction further provided that these are rebuttable presumptions.

It is clear therefore, that Instruction 38 permits the element of "purposely or knowingly" to be proved by the use of the Sandstrom-type presumptions.  Thus, if the jury used either one of these presumptions in determining the first step that defendant committed a "purposeful assault", the verdict cannot stand.  Any finding that defendant had the particular purpose to inflict "cruel suffering" would be tainted by the initial determination that defendant had committed a "purposeful assault" by the use of the Sandstrom-type presumptions.

It is possible, on the other hand, to construe the special jury finding that the deliberate homicide was committed "by means of torture", as embracing the general purpose of the defendant to assault the victim.  If the jury followed this path, it need not have used the unconstitutional presumptions contained in Instruction 38, supra.  It is, however, quite unlikely that the jury followed this path to its verdict.

Initially, it must be emphasized again that it remains a mystery as to the path or paths chosen by the jury in reaching its verdict.  But neither do the instructions telling the jury how to proceed, or the verdict form itself, support a conclusion that the jury found defendant guilty of deliberate homicide "by means of torture" in one fell swoop.  Rather, Instruction 54, Part II, tells the jury to first determine if defendant is guilty of deliberate homicide and if it is so to then determine if the deliberate homicide was committed "by means of torture."  The two step process in the verdict form itself indicates, moreover, that the jury followed this process directed by the instruction.

There are, of course, many additional possibilities that the jury found defendant guilty of more than one count or that it found him guilty of having committed the deliberate homicide

-96-

in several alternative ways. The trial court specifically instructed the jury that this was permissible. Instruction 6, supra; Instruction 54, part II, supra. Unfortunately, the trial court did not see fit to provide the appropriate verdict forms for the jury's use.

Because of the deficient record, only the jury knows which path or paths it followed in reaching the guilty verdict. An appellate court can only speculate as to what the jury did or did not do. It is impossible to determine therefore, that the Sandstrom-type presumptions which were sprinkled so liberally throughout the instructions used in this case, did not have an impact on the decision making process of the jury. Certainly no self-respecting appellate court can declare beyond a reasonable doubt that the Sandstrom-type instructions had no impact on the decision of the jury. As a matter of fact, because of the prevalence of these unconstitutional instructions, the probabilities are clearly in favor of a determination that the jury did use these presumptions as part of its decision making process.

I cannot in good conscience declare that beyond a reasonable doubt the Sandstrom-type presumptions had no effect on the jury's verdict. Indeed, the probabilities are that they did. But I must emphasize again, that separate basis exists to reverse the deliberate homicide conviction aside from the Sandstrom issue. There is a reasonable chance that the jury convicted defendant of the so-called offense of deliberate homicide "by means of torture." Such statutory offense does not exist in this state. If the jury did in fact convict him of this nonoffense it is a frightening prospect indeed that/a defendant has been sentenced to death for a crime which does not exist. Due process of law requires for this reason alone that this conviction be reversed.

-97-

## THE KIDNAPPING STATUTES AND CHARGES FILED IN THIS CASE

The kidnapping statutes involved in this case took effect on January 1, 1976. The crimes were allegedly committed on January 21, 1974. The kidnapping statutes are contained in sections 94-5-201 through 94-5-305, R.C.M. 1947. Three of these statutes are pertinent to this case: section 94-5-302, creating and defining the crime of kidnapping; section 94-5-303, creating and defining the crime of aggravated kidnapping; and section 94-5-304, which provides that the death penalty shall be imposed if the victim is dead as a result of an aggravated kidnapping, and provided there are no mitigating circumstances.

The State charged defendant with two counts of aggravating kidnapping (Counts 3 and 4). Section 94-5-303, reads as follows:

> "(1) A person commits the offense of aggravated kidnapping if he knowingly or purposely and without lawful authority restrains another person by either secreting or holding him in a place of isolation, or by using or threatening to use physical force, with any of the following purposes:
>
> "(a) to hold for ransom or reward, or as a shield or hostage; or
>
> "(b) to facilitate commission of any felony or flight thereafter; or
>
> "(c) to inflict bodily injury on or to terrorize the victim of another; or
>
> "(d) to interfere with the performance of any governmental or political function; or
>
> "(e) to hold another in a condition of involuntary servitude." (Emphasis added.)

The penalty is provided for in subsection (2), which provides:

> "(2) A person convicted of the offense of aggravated kidnapping shall be punished by death as provided in section 94-5-304, or be imprisoned in the state prison for any term not to exceed one hundred (100) years unless he has voluntarily released the victim, alive, in a safe place, and not suffering from serious bodily injury, in which event he shall be imprisoned in the state prison for any term not to exceed ten (10) years."

Section 94-5-304, referred to in section 94-5-303(2) above, sets forth the circumstances under which the death penalty may be imposed:

"A court shall impose the sentence of death
following conviction of aggravated kidnapping
if it finds that the victim is dead as the result
of the criminal conduct unless there are mitigating
circumstances." (Emphasis added.)

Count 3 of the aggravated kidnapping charges, supra,
invokes section 94-5-303(1)(b) and alleges several alternative
ways by which the offense was committed. First, the State
alleges that defendant had the particular purpose to commit
or flee from the commission of the felony of sexual intercourse
without consent. Second, the State alleges that the defendant
had the particular purpose to commit or flee from the commission
of the felony of aggravated assault. The allegations with
respect to aggravated assault are further divided into alternative
allegations relating to the particular purpose. By Count 3,
2(a), supra, the State alleges that the kidnapping was committed
for the purpose of causing "serious bodily injury" to the victim.
(See section 94-5-202(1)(a), R.C.M. 1947.) By Count 3, 2(b), the
State alleges that the kidnapping was committed for the purpose
of causing "bodily injury" (as opposed to serious bodily injury,
above) "with a weapon". (See section 94-5-202(b), R.C.M. 1947.)
Furthermore, the "with a weapon" allegation is divided into an
allegation that the weapon used was "a rope" or "a heavy
weapon."

Count 3 adds, in the last allegation, that the victim died
as a result of the kidnapping. The victim's death, however,
is not an element of the crime of aggravated kidnapping.

Count 4 of the aggravated kidnapping charges, supra, invokes
section 94-5-303(1)(c), and alleges that defendant, in kidnapping
the victim, had "the purpose of inflicting bodily injury" on
the victim, or "threatening or terrorizing the victim. Count
4 also adds, in the last allegation, that the victim died as
a result of the kidnapping. Again, however, the victim's death
is not an element of the crime of aggravated kidnapping.

-99-

The State alleged that the victim died as a result of the kidnapping because it wanted the death penalty to be imposed should the defendant be convicted.  But under section 94-5-304, supra, it is the function of the court, not the jury, to make that finding in the event of a conviction.

AGGRAVATED KIDNAPPING--IMPACT OF THE SANDSTROM-TYPE INSTRUCTIONS

It would of course be proper to give defendant notice that the State would seek the death penalty in the event of a conviction, but the issue should never have been submitted to the jury.  The plain meaning of section 94-5-305, is that the court must make this determination of whether the victim is dead as a result of the kidnapping.

The jury had the choice of at least eight separate paths it could have taken to the verdict, as the defendant was charged in at least eight alternative ways.  The trial court's instructions also permitted the jury to take two or more paths to its verdict.  An analysis of Count 3 reveals that the jury had six separate choices; an analysis of Count 4 reveals that the jury had two separate choices.  However, the applicable instructions provide no clues as to the choice or choices the jury may have chosen.  And the verdict form upon which the jury returned its verdict, reveals absolutely nothing as to which path or paths it chose in reaching its verdict.

The trial court told the jury that it could convict the defendant on one or all of the separate charges (Instruction 6, Statement of the Case, supra).  But even if the jury chose more than one path in reaching its verdict, the trial court told the jury to return only one verdict form (Instruction 54, Part III, Verdict Forms--Aggravated Kidnapping, supra).  And the verdict itself is a simple declaration that the jury finds the defendant guilty of aggravated kidnapping:

-100-

"A. We, the jury, in the above-entitled cause,
find the defendant Guilty of the offense of
Aggravated Kidnapping as Charged.

"B. We further find that Lana Harding (did)
(did not) die as a result of said Aggravated
Kidnapping).

"(Strike out bracketed word or words that do
not apply.)"

Assuming that the jury chose only one path by which it reached its verdict, because of the multiple charges and alternative ways alleged, it had at least eight choices. Furthermore, if the jury chose more than one path to reach its verdict, and the instructions of the trial court explicitly allowed this approach, the possible combination of choices is multiplied many times over. Needless to say, it is impossible to determine which path or paths the jury chose. Before an appellate court can affirm the conviction here, it must be able to declare beyond a reasonable doubt which path or paths the jury chose and that the path or paths chosen were not impacted by the use of the unconstitutional Sandstrom-type jury instructions. An appellate court cannot in good conscience, make that declaration, and therefore the only choice is to reverse the conviction.

It should be sufficient to stop the analysis at this point and simply declare that the multiple choices available to the jury without any indication of what its choice or choices were, makes review impossible. Nonetheless, I will set forth some of the more obvious paths the jury could have taken, assuming, of course, that the jury followed or attempted to follow the applicable instructions.

The charges of aggravated kidnapping are set forth in Counts 3 and 4 of the Information, supra. There are quite a number of jury instructions which have a bearing on these charges.

-101-

Instruction 25 defines both the crime of kidnapping and the crime of aggravated kidnapping. The trial court told the jury that the crime of kidnapping requires that the act involved by done "knowingly or purposely and without lawful authority. . ." This definition is a verbatim recitation of section 94-5-302(1). In defining the crime of aggravated kidnapping the trial court told the jury that the act must be done "knowingly or purposely, and further, that it be done to accomplish one of the particular purposes charged, namely:

> "(a) to facilitate the commission of a felony, or
>
> "(b) to inflict bodily injury on the victim, or
>
> "(c) to terrorize the victim."

This instruction is, for the most part, a verbatim recitation of the /aggravated kidnapping statute, section 94-5-302(2), R.C.M. 1947.

Instruction 29, entitled Requirement of a Voluntary Act With a Mental State, is a three page instruction setting forth the various mental states which must be proved for each of the charges filed against the defendant. In relation to the offense of kidnapping, Part IV of this instruction tells the jury that:

> ". . . the voluntary act (the secreting or holding of a victim in a place of isolation without lawful authority, or the holding of said person by physical force or threats thereof) be done either knowingly or purposely." (Emphasis added.)

In relation to the offense of aggravated kidnapping, Part V of this instruction tells the jury that:

> ". . . the voluntary act (the secreting or holding the victim without lawful authority in a place of isolation, or the holding of said person by physical force or threats thereof), be done either purposely or knowingly and in addition thereto that it be done for one of the following particular purposes: either

"(a) to facilitate the commission of any felony (in this case sexual intercourse without consent of the victim, or an aggravated assault upon the victim), or

"(b) to inflict bodily injury on the victim, or

"(c) to terrorize the victim." (Emphasis added.)

Instruction 29, Part VI, provides that for the offense of sexual intercourse without consent, "that the voluntary act (sexual intercourse without consent) be done knowingly." (Emphasis added.) Instruction 29, Part VII, provides that for the offense of aggravated assault:

". . . the voluntary act (the infliction of serious bodily injury either with or without a weapon, or the infliction of bodily injury with a weapon) be done either knowingly or purposely." (Emphasis added.)

With these statements as to mental state out of the way, the trial court then gave a long series of instructions as to the methods of proof which can be used to prove the mental element involved for each crime. The unconstitutional Sandstrom-type presumptions permeate this series of instructions.

Instruction 31, entitled Mental State--Methods of Proof, set the stage by explaining the kinds of evidence: Direct Evidence; Indirect Evidence; Presumptions; and Inferences. Part II of Instruction 31, entitled Proof by Indirect or Circumstantial Evidence, subheading (2), is entitled Proof by Presumption of Law. There, the trial court sets forth the unconstitutional Sandstrom-type instructions. In essence the trial court told the jury that it is presumed that the defendant intended the consequences of his "voluntary act", and that it is presumed that an unlawful act was done with unlawful intent. (Note: I have previously set out these presumptions in the discussion relating to the deliberate homicide conviction, supra.)

-103-

In each of the instructions containing the unconstitutional presumptions the jury was told that the presumptions were rebuttable. But the jury was not told that it could accept or reject the presumptions as it saw fit. The clear meaning of the instructions taken together is that the jury must use these presumptions to find the mental element and that it was within the power of the defendant alone to rebut these presumptions. Instruction 31 stated:

> "2. Proof by Presumption of law. (Deductions which the law expressly directs to be made from particular facts):
>
> ". . .
>
> ". . . in addition thereto the law presumes, that is, the law expressly directs the jury to reason: That an unlawful act was done with an unlawful intend and also that a person is presumed to intend the ordinary consequences of his voluntary act." (Emphasis added.)

From these general instructions as to methods of proof the trial court then provided a long series of instructions describing for the jury the use of the presumptions in relation to each of the offenses charged. In this respect the words or phrases "voluntary act", "unlawful act", and "purposely or knowingly", or "intent", take on a real importance because the trial court told the jury to find the requisite mental element by the use of the unconstitutional Sandstrom-type instructions. These presumptions were hammered home to the jury again and again.

The State charged in one of the deliberate homicide counts and in the aggravated kidnapping counts that the defendant had a particular purpose in mind by committing the act. With respect to this particular purpose, the trial court in Instruction 32, told the jury that such particular purpose could never be presumed:

> "in offenses which require proof of a particular purpose the particular purpose required may never be proved by means of legal presumptions, but must be proved by means of inferences only. In this

-104-

case the offenses of: Deliberate Homicide by Means of Torture, and Aggravated Kidnapping all require proof that the defendant committed the particular act charged for a particular purpose, _in addition to proof that he committed said act either knowingly or purposely._" (Emphasis added.)

Instruction 36, entitled _Method of Proof--Aggravated Kidnapping_, provides as follows:

"The offense of Aggravated Kidnapping, _in addition to the proof required to prove the offense of kidnapping_, requires that the kidnapping was committed for a particular purpose.

"In this case Count 4 requires proof that the kidnapping was for a particular purpose either to inflict bodily injury on Lana Harding, or to terrorize her and Count 3 requires that the kidnapping have been for the particular purpose of facilitating the commission of a felony: either sexual intercourse without her consent, or to commit an Aggravated Assault on her.

"_Therefore, if you find_ beyond a reasonable doubt _that the defendant,. . . did kidnap Lana Harding, before he can be found guilty of the offense of_ aggravated kidnapping as charged in the Information, _you must further find_ beyond a reasonable doubt _that he acted while having at least one of the particular purposes charged._

"Since a particular purpose may never be presumed in law, the mental state of either knowingly or purposely secreting or holding for a particular purpose must be proved by inference only without the use of any presumptions.

"This means that if you find beyond a reasonable doubt, that the defendant did kidnap Lana Harding, you are permitted to deduce or reason from any and all facts and circumstances proved in connection therewith that he did so with one or more of the particular purposes charged in Counts 3 and 4, and to find beyond a reasonable doubt that he committed the offense as charged." (Emphasis added.)

Although it may be otherwise deficient, Instruction 36, standing alone, is constitutional. It contains no _Sandstrom_-type presumptions. If an appellate court could determine beyond a reasonable doubt that the jury used Instruction 36 as its sole guide in finding the elements of the offense, it would then have to take a long, hard look as to whether the remaining _Sandstrom_-type instructions would or would not have tainted the jury verdict. If it knew the path chosen by the

-105-

jury, an appellate court could declare that the jury's finding of a particular purpose, in order to convict defendant of aggravated kidnapping, embraced by necessity the general intent or general purpose to kidnap. The conscious object to restrain the victim (required for the crime of kidnapping) could arise by necessity from a finding of a particular purpose to either commit a forcible felony or to terrorize the victim. See section 94-5-303, supra. This would be a constitutional path, for the specific finding of a particular purpose would indicate that the jury found this particular purpose only by the use of permissive inferences as directed by Instruction 36.

The most obvious defect in this analysis is that no self-respecting appellate court could ever declare beyond a reasonable doubt that the jury took this path to its verdict. There are, moreover, strong reasons to believe that the Sandstrom-type presumptions had an effect on the decision making process of the jury.

No one knows of course, which one or more particular purposes the jury may have found under the charges. For example, under Count 3 did the jury find that defendant had the "particular purpose either to inflict bodily injury on Lana Harding, or to terrorize her?" Or did it find both such purposes? Under Count 4 did the jury find that defendant had the particular purpose "to facilitate the commission of a felony: either sexual intercourse with Lana Harding without her consent, or to commit Aggravated Assault upon her?" Or did it find both? Or did the jury find one or more of the particular purposes under Count 3 and one or more of the purposes under Count 4? Or did it find all of the particular purposes under Count 3 and Count 4? No appellate court would be so irresponsible to declare beyond a reasonable doubt which theory or theories the jury used in reaching its verdict.

It appears from Instruction 36, on the other hand, that the jury was told to make a two step analysis in determining whether defendant was guilty of aggravated kidnapping. First, the jury was to determine if defendant committed the offense of kidnapping (as opposed to aggravated kidnapping). Second, if the jury found he did commit the offense of kidnapping, it was then to determine if it constituted aggravated kidnapping. Thus the trial court told the jury by Instruction 36, supra:

> "The offense of Aggravated Kidnapping, in addition to the proof required to prove the offense of kidnapping, requires that the kidnapping was committed for a particular purpose.
>
> ". . .
>
> "Therefore, if you find beyond a reasonable doubt that the defendant,. . . did kidnap Lana Harding, before he can be found guilty of the offense of aggravated kidnapping as charged in the Information, you must further find beyond a reasonable doubt that he acted while having at least one of the particular purposes charged." (Emphasis added.)

This two step process for the jury's findings is further suggested by Instruction 29, Part V, and by Instruction 32, supra, which requires that the particular purpose be proved "in addition to proof that he committed said act either knowingly or purposely." (Emphasis added.)

Instructions 25, 29 (Part IV, and 35, are pertinent to the offense of kidnapping (as opposed to the offense of aggravated kidnapping). Instruction 25 sets forth the statutory definition of kidnapping (section 94-5-302, supra) and specifically states that the mental act required for its commission is "purposely or knowingly." Instruction 29, Part IV, provides that:

> ". . . the voluntary act (the secreting or holding of the victim in a place of isolation without lawful authority, or the holding of said person by physical force or threats thereof) be done either knowingly or purposely." (Emphasis added.)

-107-

Instruction 35, Part II, _Proof by Presumption_ sets out the _Sandstrom_-type presumptions:

> ". . . if you find that the defendant,. . . without lawful authority, restrained Lana Harding, either by secreting her in a place of isolation, or by using physical force to hold her, the law presumes that he acted therein with an unlawful intent, purpose or knowledge, and expressly directs you to so reason." (Emphasis added.)

If the jury took a two step process to its verdict, and it appears that it was directed to do so, there can be no question that the jury may well have used the unconstitutional presumptions contained within Instruction 35 in reaching its decision that defendant committed the offense of kidnapping. Thus, the finding of intent (herein classified as "purposely or knowingly") to kidnap could well have been affected by the unconstitutional presumption. Certainly no court could declare beyond a reasonable doubt that the jury's finding as to "purposely or knowingly" was not affected by the unconstitutional presumption whereby the jury was specifically _directed_ to "presume that he acted therein with an unlawful intent, purpose, or knowledge. . ."

Thus, if the jury first found the offense of kidnapping before proceeding to the next question of whether defendant had committed the offense of aggravated kidnapping, its finding of a particular purpose for aggravated kidnapping would be tainted by its reliance on the unconstitutional presumption in its first finding. Clearly, the verdict would then be built in part upon the use of an unconstitutional presumption.

It is perhaps more reasonable to view the instructions in a fashion that permits the general purpose to commit kidnapping to be embraced by the more specific particular purpose finding which is necessary for a conviction of aggravated kidnapping. If the question were not a constitutional one perhaps an appellate court could reach this conclusion. But our duty here is confined to a determination

-108-

beyond a reasonable doubt, as to whether or not the jury chose a constitutional path and ignored the unconstitutional paths to reach its verdict. There is abundant reasonable doubt in this case to believe that the constitutional error inhering in the instructions, was not harmless.

It is, moreover, not likely that the jury, in reaching its decision as to a particular purpose, would not have run into the Sandstrom-type presumptions. If one assumes that the jury found the particular purpose as alleged under Count 4, to either commit sexual intercourse without consent or aggravated assault, or both, as part of its decision making process the jury could well have used the Sandstrom-type presumptions contained in Instructions 37 (sexual intercourse without consent) and 38 (aggravated assault).

By Instruction 37, the trial court told the jury that the Sandstrom-type presumptions could be used to prove the voluntary act of "knowingly" in relation to the offense of sexual intercourse without consent. By Instruction 38, the trial court told the jury that the Sandstrom-type presumptions could be used to prove the voluntary act of "knowingly or purposely" in relation to the offense of aggravated assault. Thus, the jury could have used these presumptions to conclude that defendant was guilty of sexual intercourse without consent, or aggravated assault, or both. With this decision made it would not be at all difficult to conclude that defendant kidnapped the victim for the particular purpose of accomplishing these offenses. At least, one cannot in good conscience declare beyond a reasonable doubt that these Sandstrom-type instructions had no influence whatever on the decision making processes of the jury.

-109-

SUMMARY AND POSTSCRIPT

I concluded in my dissent in McKenzie II that we had denied defendant's constitutional rights at both ends of the procedural spectrum. First, we did not begin to fairly consider defendant's assertions that his rights had been violated under the Fourth Amendment and under Art. II, §11 of the Montana Constitution. Second, this Court did not fairly apply and fairly analyze the existing laws in relation to the death penalty. My views on these two questions are even more resolute. Now we can add to this our failure to fairly consider whether the barrage of unconstitutional Sandstrom-type instructions was prejudicial error. Our analysis and conclusion that the instructions were harmless can never be accepted by the United States Supreme Court as an appropriate standard. And now we can add to this the strong and frightening possibility that defendant may have been convicted of an offense and sentenced to death for a crime that does not exist in the laws of this state--deliberate homicide by means of torture. Never have I seen a case more replete with constitutional error.

I end this dissent with a postscript. In McKenzie I and McKenzie II, we held that defendant's procedural rights in relation to the death penalty are adequately protected by his right to take his case before the Sentence Review Board after we had reviewed his case on direct appeal. I dissented to this view because the sentence review statutes (sections 95-2501 through 95-2504, R.C.M. 1947; 581 P.2d 1235 through 1266), clearly show on their face that they do not apply to review of a death penalty. Moreover, assuming that they do, they are defective because the defendant does not have a right to appeal to this Court from any decision made by the Sentence Review Board, a panel of district judges. Indeed, after

defendant took his case to the Sentence Review Board, he petitioned this Court to review the Board's decision, and we declined. I dissented because any system of meaningful review must provide that the state's highest court will review the final death penalty decision. See order entered in State v. McKenzie, Cause No. 13011, dated February 20, 1979.

The majority view in McKenzie I and McKenzie II, and in Cause no. 13011, supra, rests, of course, on an assumption that the sentence review statutes indeed do apply to review a death sentence. But lo and behold, strange as it may seem, it is now the view of the Montana Supreme Court that sentence review statutes do not apply to a sentence of death and therefore that the Sentence Review Board cannot review a death sentence. This is, of course, a 180 degree shift from McKenzie I and McKenzie II, and from State v. McKenzie, Cause No. 13011. This decision was recently made in the Coleman order: State of Montana ex rel. Dewey Eugene Coleman v. Sentence Review Division of the Supreme Court of Montana, No. 80-89, dated March 21, 1980.

In the Coleman case, this Court denied an application of another death penalty defendant for a writ of supervisory control, and properly so. Defendant is under sentence of death but also he has been sentenced to imprisonment by con-viction on a separate count. Defendant petitioned this Court to stay proceedings in District Court for an execution date for the reason that defendant first had the right to go to the Sentence Review Board to have it review a non-death penalty sentence. We declined, holding that should his death penalty sentence be overturned in the Federal Court system, he could then apply to the Sentence Review Board to review his non-death penalty sentence. What is important however, is what we said in relation to the application of the sentence review statutes to a death sentence:

-111-

"The review application by relator was denied by the Sentence Review Division on the ground of lack of jurisdiction. It pointed out that review of sentences is available only to persons sentenced to a term of one year or more in the state prison, section 46-18-903, MCA, and that it had no jurisdiction to review death sentences. It also pointed to section 46-18-307, MCA, which provides for automatic review of death sentences by the Montana Supreme Court.

"We hold that the denial of review by the Sentence Review Division was correct. With respect to the death sentence, the only statutory agency with power to review is this Court. We have fulfilled our duties in that connection. It would not only be extra-statutory but an anomaly were we to hold that the conclusions of this Court on review of death sentences were subject to later review by the Sentence Review Division of this Court." (Emphasis added).

Needless to say, a judicial system having fundamental fairness as one of its underpinnings, cannot long tolerate this kind of inconsistency--particularly where death itself is the underlying issue.

I leave it for others more perceptive and scholarly than myself to determine the status of constitutional law in this state in the wake of McKenzie I and McKenzie II, and now McKenzie III. Perhaps, however, an appropriate title for an article or book on the subject would be: The McKenzie Rules: Not For General Application--Apply Sparingly.

Justice